Kenneth W. GROSS, PBHG Growth Fund, Charles S. Grobe, Carley Capital Group, WME Management Group, L.P., Catherine Baker Knoll, Vicki Mann, Raymond E. Smith, Deborah J. Smith, Leonard C. Mead, Jr., Dennis McDowell, and Deborah Ann Smith, Pennsylvania Public School Board Employees' Retirement Board, Plaintiffs,

v.

MEDAPHIS CORPORATION, Randolph G. Brown, Michael R. Cote, and James S. Douglass, Defendants.

Civ. A. No. 1:96–CV–2088–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 27, 1997.

W. Pitts Carr, Carr, Tabb & Pope, Atlanta, GA, Martin D. Chitwood, Chitwood & Harley, Atlanta, GA, Richard H. Weiss, David H. Bershad, Steven G. Schulman, Janine Pollack, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert Roseman, Jeffrey L. Kodroff, Mark J. Dorval, Spector & Roseman, Philadelphia, PA, Jeffrey S. Nobel, Schatz & Nobel, Hartford, CT, Sherrie R. Savett & Genna D. Kidd, Berger & Montague, Philadelphia, PA, Leonard Barrack & Anthony Bolognese, Barrack, Rodos & Bacine, Philadelphia, PA, Charles Wilson DuBose, Schnader, Harrison, Segal & Lewis, Atlanta, GA, for plaintiffs.

M. Robert Thornton, Robert Riles Ambler, Jr., Jeffrey S. Cashdan, King & Spalding, Atlanta, GA, for defendants.

### ORDER

HULL, District Judge.

Plaintiffs bring this action against Defendants Medaphis Corporation and its former officers Randolph Brown, Michael Cote. and James Douglass for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934.[1] This matter is before the Court on Defendants' Motion to Dismiss [56-1] Plaintiffs' Consolidated Second Amended Class Action Complaint. The Court stayed all discovery pending resolution of Defendants' Motion to Dismiss.

### I. PLAINTIFFS' ALLEGATIONS

For purposes of Defendants' Motion to Dismiss, the Eleventh Circuit instructs that the Court should accept the allegations in Plaintiffs' Amended Complaint as true and construe those allegations in a light most favorable to Plaintiffs, *Bank v. Pitt,* 928 F.2d 1108, 1109 (11th Cir.1991); that the Court should ignore any allegations which contain no more than opinions or legal conclusions, *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir. 1996); and, that the Court may grant Defendants' Motion to Dismiss only if it appears beyond doubt that Plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Milburn v. United States,* 734 F.2d 762, 765 (11th Cir. 1984). Thus, the Court first summarizes Plaintiffs' version of the facts alleged in the 86 page Consolidated Second Amended Class Action Complaint.

A. *Medaphis Allegedly Engaged In A Fraudulent Scheme To Keep Its Stock Prices High To Ensure Available Financing For Business Acquisitions*

Plaintiffs purchased or otherwise acquired Medaphis common stock between February 6, 1996 and October 21, 1996. Amended Complaint ("AC"), ¶ 1. Defendant Medaphis Corporation ("Medaphis") sells outsourced business management services and systems to doctors and hospitals, primarily for the management of billing and accounts receivable. *Id.* ¶ 2. Medaphis pursued an aggressive growth strategy through acquisitions of more than 40 companies. *Id.* Medaphis used

---

**1.** Plaintiffs voluntarily dismissed Defendant John    Holton on September 19, 1996.

primarily its common stock as currency in its acquisitions. *Id.* Plaintiffs allege that Defendants' scheme was to keep the value of its stock high because the higher the value of its stock, the less shares Medaphis had to transfer to effectuate each of its acquisitions. *Id.* ¶¶ 94, 103.

Defendants inundated the marketplace with glowing descriptions of Medaphis's past and current financial and business successes. *Id.* ¶ 97. As outlined below, Plaintiffs allege that Defendants wilfully concealed and knowingly misrepresented, *inter alia*, (a) the financial condition of Medaphis, (b) the state of affairs of Medaphis's projects, and (c) the severe operational problems experienced by Medaphis and its subsidiaries. *Id.* ¶ 55.

### B. *Defendants Falsely Reported Profits Of $4 Million For The Fourth Quarter Of Fiscal 1995 Instead Of The Actual $1.1 Million Loss*

According to Plaintiffs, Defendants realized that to maintain Medaphis's high stock price, Medaphis must meet earnings estimates made by Medaphis and private securities analysts. *Id.* ¶ 6. Defendants falsely reported inflated earnings estimates to keep its stock prices high, and then later admitted that its earlier earnings estimates were incorrect. *Id.* ¶¶ 6, 9–16, 45.

Specifically, on February 6, 1996, Defendants issued a press release announcing Medaphis's fourth quarter 1995 earnings of $11.4 million, or $0.22 per share. *Id.* ¶ 50. The earnings resulted in a profit of $4 million and represented a 50% increase over earnings in the fourth quarter of 1994. *Id.* For 1995, Medaphis reported total earnings of $41.9 million, or $0.82 per share, which represented an increase of 80% over earnings for 1994. *Id.*

Defendants allegedly knew that Medaphis's reported earnings for the fourth quarter of 1995 were inflated by at least $5 million because Defendants knowingly employed improper and deceptive accounting principles in arriving at that result. *Id.* ¶ 55. Under Generally Accepted Accounting Principles ("GAAP"), a "profit is deemed realized when a sale in the ordinary course of business is effected, *unless the circumstances are*

*such that the collection of the sale price is not reasonably assured."* *Id.* (quoting Accounting Research Bulletin ('ARB') 43, Ch. 1, § A (emphasis supplied)). "Revenues and gains are realizable when related assets received or held are *readily convertible to known amounts of cash or claims to cash."* Financial Accounting Standards Board ("FASB") Statement of Concepts ("CON"), ¶ 83(a) (emphasis supplied).

In reporting the fourth quarter and year end for 1995, Medaphis included revenue from software licences issued by Imonics during the fourth quarter. *Id.* Medaphis aggressively enlisted major customers, and included revenue from these contracts in its fourth quarter earnings, only to provide these customers with secret side letters relieving them of their obligations under their agreements. *Id.* Plaintiffs allege that Defendants knowingly and falsely inflated its revenues by over $5 million from these agreements. *Id.* In October 1996, Medaphis reported that instead of a $4 million profit, it took a $1.1 million loss for the fourth quarter of 1995. *Id.*

### C. *Defendants Falsely Reported $12.5 Million In Revenues For The First Quarter Of Fiscal 1996 When Defendants Knew That The Revenue Had Not Been Earned*

Plaintiffs also allege that Medaphis knowingly and deceptively reported inflated revenues of $12.5 million for the first quarter of 1996 from a joint venture with a subsidiary of Bertelsmann, AG, a German corporation. *Id.* ¶¶ 8, 82–84. The "Joint Venture" was formed to pursue custom software development and systems integration projects from customer service systems in Europe over a multi-year period. *Id.* ¶ 82.

On March 31, 1996, the last day of the first quarter of 1996, the Joint Venture concluded an agreement with a German telecommunications entity to provide systems integration and work flow engineering systems and services (the 'Systems Integration Contract'). *Id.* ¶ 83. Immediately upon entering into the Systems Integration Contract on March 31, 1996 and before doing any of the work on the

Contract, Medaphis recognized $12.5 million of Joint Venture net earnings, thereby significantly improving reported revenues and net earnings for the first quarter of 1996. *Id.* Including this $12.5 million from the Systems Integration Contract allowed Medaphis to report a $13.2 million profit for the first quarter of 1996. *Id.*

· Under GAAP principles. revenues from the Systems Integration Contract should not have been recognized until earned. "[R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." *Id.* ¶ 90. Defendants knew that recognizing the $12.5 million in revenues on March 31, 1996 was improper and deceptive because the Systems Integration Contract was subject to numerous contingencies and obligations and thus had produced no income on March 31, 1996. *Id.* ¶¶ 90–91, 131(h). Defendants knew that the collection of the sales price was not reasonably assured because Imonics, Inc. ("Imonics"), the Medaphis subsidiary responsible for meeting Medaphis's obligations under the Contract, was experiencing severe performance problems. and was unable to perform its obligations under the Systems Integration Contract. *Id.*

Very soon after fraudulently including this $12.5 million in revenues, Medaphis began reporting significant problems with Imonics and its Systems Integration Contract. *Id.* ¶ 108. Medaphis later reported that it would incur significant financial charges in restructuring the Systems Integration Contract because of operational problems at Imonics. *Id.* ¶ 109. Plaintiffs allege that Defendants knew of Imonics's problems all along and knew that these problems would prevent Imonics from meeting its obligations under the Systems Integration Contract. *Id.* ¶ 69.

D. *Defendants Fraudulently Reported Inflated Revenues for the Second Quarter of Fiscal 1996*

On July 23, 1996, Defendants issued a press release announcing Medaphis's financial results for the second quarter of 1996, ending June 30, 1996. *Id.* ¶ 104. Defendants reported that revenue for the second quarter was $175.2 million, up 24% from the second quarter of 1995. *Id.* Excluding merger and other one time costs, net income for the second quarter was up 159%, with earnings per share up 150%. *Id.* For the six months ending. June 30, 1996, Medaphis reported a 255% increase in revenues, and a 500% increase in net income. *Id.*

These financial disclosures were prepared in violation of GAAP principles and were thus false and misleading. *Id.* ¶ 107. Medaphis's recognizing the $12.5 million in revenue upon signing the Systems Integration Contract on March 31, 1996 resulted in inflated revenues being reported in the second quarter of 1996. *Id.* The revenue from the Systems Integration Contract should have been recognized, if at all, ratably over the life of the contract. *Id.* ¶¶ 90, 91, 107.

E. *Defendants Misrepresented The Past And Current Success Of Imonics, Inc. And The "Re–Engineering Project"*

Plaintiffs allege that Defendants' repeatedly boasted of the historical and future success of Imonics, acquired in 1994. *Id.* ¶ 4. Imonics helped companies coordinate their different types of computer systems and connect their numerous and sometimes different desktop computers. to a single "server" technology. *Id.* Defendants publicly represented that Imonics was a major contributor to Medaphis's current revenues and profits. *Id.*

Medaphis placed Imonics in charge of "reengineering" Medaphis's core physician billing business, Medaphis Physicians Services Corporation ("MPSC"). *Id.* Defendants represented that Imonics provided Medaphis with an "immense competitive advantage." *Id.* In a press release dated February 6, 1996, Defendant Brown noted that the Re–Engineering Project was progressing well and achieving "significant milestones." *Id.* ¶ 51. The press release also stated that Medaphis's technology division (which includes Imonics and another company, Atwork, a leader in healthcare information systems) "continued to grow rapidly and show positive operating results outperforming our expectations in the second half of 1995 [and was] effectively offsetting the margin pressure and results" being experienced by MPSC. *Id.*

At the time Defendants made these positive historic statements, Defendants knew that Atwork's sales pipeline was in serious decline and had experienced operating flaws in its software products and that Imonics was experiencing severe operational problems including excessive staffing and payroll, inadequate cost controls, significant cost overruns, poor operating performance, and shoddy execution on critical projects. *Id.* ¶ 55. Defendants knew that these problems were so severe that they negated Imonics's ability to perform as positively as portrayed by Defendants. *Id.* Defendants' statements that the technology division was "effectively offsetting" the margin pressures and results of MPSC were materially false and misrepresented current conditions when made. *Id.*

### F. Defendants Caused Securities Analysts To Deliver Misleading Reports

According to Plaintiffs, Defendants also employed private securities analysts in their alleged scheme to mislead the public about the success Medaphis enjoyed during the proposed class period. *Id.* ¶¶ 48, 49. Medaphis's practice was to have key members of its management team communicate with analysts on a regular basis. *Id.* ¶ 49. Defendants knowingly and deceptively made misleading statements to the analysts causing the analysts to issue glowing reports about Medaphis. *Id.* ¶¶ 52–54, 85, 89, 106. Defendants adopted the glowing reports of the analysts knowing that the reports were materially misleading. *Id.* ¶.107.

#### 1. Defendants' February 6, 1996 Press Release Resulted in the Issuance of Several Misleading Analysts' Reports

For example, after Medaphis issued its February 6, 1996 press release announcing its 1995 fourth quarter and year end results, Donaldson Lufkin & Jenrette issued a February 7, 1996 research report favorable to Medaphis which expressed comfort with Donaldson's earlier positive projections regarding Medaphis's earnings through 1997. *Id.* ¶ 52. Hambrecht & Quist issued a similar favorable report, predicting that "MPSC's growth ... should accelerate Medaphis' in-

ternal growth rate" and that "the long term efficiencies gained will more than offset any pricing pressure in the core billing and receivables market and fuel significant EBITDA margin expansion in 1997." *Id.* ¶ 53. Likewise, Morgan Stanley issued a February 6, 1996 report stating that Medaphis was buoyed by its strong technology divisions:

> MEDA's overall fundamentals continue to be buoyed by its strong technology divisions. We estimate that the companies Atwork, Imonics, and recently acquired Consort divisions will be the driving force to margins. We estimate that these divisions are on the order of 1–2 times more profitable than MEDA's core A/R, billing business. As evidence of MEDA's conviction here, it has significantly added to staff at the Imonics subsidiary, increasing headcount from 80 to 300 in 1995.

*Id.* ¶ 54.[2] Each of these reports was based on misleading information provided by Defendants.

#### 2. Analysts' Reports Contained Misleading Earnings Forecasts for the Third and Fourth Quarter of 1996 Based On Defendants' Misleading Information

After Defendants' July 23, 1996 press release announced Medaphis's results for the second quarter of 1996, Defendant Brown continued to assure the investment community that Medaphis's technology companies were "generating strong results" and that these "strong results" were attributable to Medaphis's acquiring Health Data Sciences Corporation, Rapid Systems Solutions, and BSG Corporation. *Id.* ¶ 105.

On July 24, 1996, Bear Stearns and Cowen & Co. issued favorable reports about Medaphis based on this misleading information from Defendants. *Id.* ¶ 106. Donaldson Lufkin & Jenrette also issued a favorable report on July 24, 1996, stating:

> EPS for the next two quarters should be $0.28 and $0.30, respectively. Management indicated comfort with street estimates for the third and fourth quarter of this year. This is in sharp contrast to previous statements about the last few quarters when management consistently

---

**2.** Medaphis stock is traded under the symbol "MEDA."

hedged about its near-term operating results.

*Id.* These reports were based on misleading representations in Medaphis's July 23, 1996 press release. *Id.* ¶ 107. Defendants knew this press release and the analysts'. reports were misleading because Defendants knew about the problems with its technology divisions, discussed *supra.* Defendants, without reasonable basis, adopted and endorsed the analysts' reports by expressing comfort with the statements therein. *Id.* ¶¶ 106, 107, 131(q).

G. *In August And October 1996, Defendants Reveal Serious Ongoing Problems With Imonics And The Systems Integration Contract And Restate Medaphis's Earnings For The Fourth Quarter Of Fiscal 1995*

After mostly positive reports on Medaphis for months, the investing public heard significantly negative news about Medaphis for the first time on August 14, 1996. *Id.* ¶ 108. Medaphis reported that it would suffer a substantial loss for the third quarter of 1996, ending September 30, 1996. *Id.* Medaphis attributed this loss to a $35 to $40 million write-off, which included $9 million to restructure the Systems Integration Contract, $15 million to reorganize Imonics, $11 million in ReEngineering Project costs, and $5 million in "other" costs. *Id.* ¶¶ 9, 108–11. Medaphis disclosed that Imonics had severe operational problems and thus could not offset pressures adversely affecting MPSC. *Id.* ¶ 10.

Medaphis admitted that it had known since at least July 25, 1996 that Imonics's operating problems were so significant that Imonics was unable to perform its obligations under the Systems Integration Contract. *Id.* ¶ 11. As a result, Medaphis announced that it would no longer be able to pursue its acquisition strategy. *Id.* With this announcement, the market price for Medaphis stock immediately plummeted from $38.875 per share to $14.25 per share. *Id.* ¶ 12.

Even after these revelations, Defendants persisted in making misleadingly optimistic statements. *Id.* ¶ 118. On August 21, 1996, Defendants told analysts that after uncovering problems at Imonics and MPSC, management had assessed the possibility of additional charges and further reductions in earnings expectations, and had "concluded that all of the potential problems had been reserved against." *Id.* ¶¶ 13, 119.

Two months later, however, Defendants' representations proved to be false. On October 22, 1996, Medaphis announced that its loss for the third quarter of 1996 would be almost double the loss announced on August 14, 1996 and that it would further reduce its 1997 earnings estimates. *Id.* ¶¶ 121–23. Additionally, Medaphis announced for the first time that its previously reported revenues and earnings for the fourth quarter of 1995 and the year 1995 were incorrect. *Id.* ¶ 125. Restated results reduced the fourth quarter 1995 results from earnings of $4 million to a loss of $1.1 million. *Id.* ¶ 125. Medaphis also announced that it had written off additional millions of dollars related to the reorganization of Imonics, and that the entire senior management of Imonics had been fired. *Id.* ¶¶ 14, 123. In response to these announcements, Medaphis stock fell to a 52 week low of $10.375 per share. *Id.* ¶ 129.

Following Defendants' October 22, 1996 disclosures, three private securities analysts issued statements expressing shock or attacking Defendants' credibility. *Id.* ¶ 17. Deutsche Morgan Grenfell/CJL opined that "[t]here were clearly more negative issues at hand within the Company than were delineated in the August pre-announcement," and that "we don't believe management had been as forthcoming as we would like with operational issues." *Id.* Donaldson, Lufkin & Jenrette complained that Medaphis's "management had suggested that MPSC had turned the corner in the second quarter" and, as a result, now "have no credibility with investors." *Id.* Finally, Cowen & Co. termed the developments a "complete shocker" in view of Medaphis's contrary earlier representations. *Id.*

## II. DISCUSSION

A. *Standard For Pleading Scienter Under The Private Securities Litigation Reform Act Of 1995 Has Become The More Stringent Standard Of "Strong Inference"*

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or

employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To state a valid Rule 10b–5 claim, "a plaintiff must allege that the defendant: (a) made a misstatement or omission, (b) of material fact, (c) with scienter, (d) in connection with the purchase or sale of securities, (e) upon which the plaintiff relied, and (f) that reliance proximately caused the plaintiff's injury." *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1250–51 (N.D.Ill. 1997) (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir.1995)).[3]

Allegations of fraud under Rule 10b–5 of the Exchange Act also must satisfy the requirements of Federal Rule of Civil Procedure 9(b) to survive a motion to dismiss. Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." *Rehm*, 954 F.Supp. at 1251 (quoting Fed.R.Civ.P. 9(b)). A sufficient level of factual support for a 10b–5 claim may be found where the circumstances of the fraud are pled in detail. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Plaintiffs' claims under the Securities Act are based primarily on the same allegations of fraud which form Plaintiffs' claims under the Exchange Act. While Plaintiffs are not required to allege fraud to state a claim under the Securities Act, the allegations of fraud in support of their claims under the Securities Act also must be pled with sufficient particularity to satisfy Rule 9(b). *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir.1996); *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir.1996).

■ Defendants primarily attack the sufficiency of Plaintiffs allegations of scienter in their 10b–5 claims. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); *see also Rehm*, 954 F.Supp. at 1251. The standard for pleading scienter has become more stringent under the recently enacted Private Securities Litigation Reform Act of 1995 ("PSLRA"), which amends the Exchange Act and the Securities Act. The PSLRA mandates that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If a complaint fails to do so, the PSLRA requires dismissal. 15 U.S.C. § 78u–4(b)(3)(A); *see also Rehm*, 954 F.Supp. at 1251. Under the new strict pleading requirements, any complaint which satisfies the PSLRA also satisfies Rule 9(b).

No federal appellate court has decided what type of pleaded facts are sufficient to give rise to a "strong inference" that a defendant has acted with the required state of mind. Plaintiffs stress that the new statutory standard has its genesis in pre-PSLRA decisions of the United States Court of Appeals for the Second Circuit and thus the Second Circuit precedent should be followed in applying the "strong inference" standard. *See, e.g., Shields v. Citytrust Bancorp. Inc.*,

---

3. Plaintiffs rely on the "fraud on the market" doctrine to show reliance. The premise of the doctrine is that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, all material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). Under the doctrine, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed. *Id.* at 247, 108 S.Ct. at 991–92; *see also* Lipton v. Documation, Inc., 734 F.2d 740, 743 (11th Cir.1984); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1303–04 (C.D.Cal.1996). Plaintiffs allege the market for Medaphis stock was an efficient market and that Medaphis stock met the requirements for and was actively traded on the NASDAQ National Market System. Defendants do not challenge Plaintiffs' reliance on this doctrine. Instead, Defendants challenge primarily whether any misstatements or omissions were made, whether any such misstatements or omissions were material, and whether Plaintiffs sufficiently allege fraud or scienter.

25 F.3d 1124, 1128 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir.1993). The Second Circuit held that the requisite "strong inference" could be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields*, 25 F.3d at 1128; *Time Warner*, 9 F.3d at 268–69; *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46. 50 (2d Cir.1987), *overruled on other grounds United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc).

The current debate percolating in federal district courts, and represented by the parties' respective positions in this case, is whether the PSLRA adopted a "strong inference" standard which incorporates (in part or in whole) the Second Circuit's precedent or whether the PSLRA adopted a standard more stringent than the Second Circuit's, rendering that precedent inapplicable. *Compare Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246 (N.D.Ill.1997) (following pre-PSLRA Second Circuit case law), *with In re Silicon Graphics, Inc. Sec. Litig.*, No. 96–0393, 1996 WL 664639 (N.D.Cal. Sept. 25, 1996) (holding that Congress intended to adopt a standard more stringent than the pre-PSLRA Second Circuit standard).[4]

Even assuming *arguendo* that Congress intended for courts to apply the "strong inference" standard in a more stringent manner than pre-PSLRA Second Circuit cases, it is not clear whether Congress intended for courts (1) to ignore the Second Circuit's pre-PSLRA reference to motive, opportunity, and recklessness, and instead to focus on the Second Circuit's reference to facts constituting circumstantial evidence of conscious misbehavior, or (2) to accept the Second Circuit's pre-PSLRA reference to (a) *motive and opportunity* and (b) circumstantial evidence of conscious or *reckless* behavior, but only to require plaintiffs to plead these things with more particularity than did the Second Circuit prior to the enactment of the PSLRA. Indeed, the Eleventh Circuit recently held in another other context that recklessness may constitute circumstantial evidence of conscious deceit. *See, e.g., In re Abry*, No. 96–8834, slip op., at 4, 103 F.3d 148 (11th Cir. Nov. 26, 1996) (citing *In re Bardwell*, 610 F.2d 228, 229 (5th Cir.1980)) (concluding in a different context that reckless disregard to the truth is tantamount to fraudulent intent).[5]

**4.** A majority of courts agree with *Rehm* and have held, or implicitly assumed, that Congress did not intend for courts to interpret the PSLRA's new standard for pleading scienter without at least referencing the Second Circuit's pre-PSLRA case law. *See Page v. Derrickson*, No. 96–842, 1997 WL 148558, at *9 (M.D.Fla. Mar. 25, 1997); *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1195–96(N.D.Ill.1997); *Sloane Overseas Fund v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1377 (S.D.N.Y.1996); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1311–12 (C.D.Cal.1996); *Fischler v. AmSouth Bancorporation*, No. 96–1567, 1996 WL 686565, at *2 (M.D.Fla. Nov. 14, 1996); *Zeid v. Kimberley*, 930 F.Supp. 431, 438 (N.D.Cal.1996). However, two courts agree with the *Silicon Graphics* decision, finding Second Circuit case law relating to motive, opportunity, and recklessness inapplicable. *See Norwood Venture Corp. v. Converse, Inc.*, 959 F.Supp. 205, 208–09 (S.D.N.Y.1997); *Friedberg v. Discreet Logic Inc.*, 959 F.Supp. 42 (D.Mass. 1997).

Further, the Securities & Exchange Commission filed an amicus curiae brief requesting the California district court to reconsider its decision in *Silicon Graphics*. The SEC posits that recklessness still is sufficient to establish scienter under the Exchange Act, even under the stringent standards of the PSLRA. *Brief for Securities & Exchange Commission, In re Silicon Graphics, Inc. Sec. Litig.*, No. 96–0393, 1996 WL 664639 (N.D.Cal. Sept. 25, 1996). Courts have given deference to the views of the SEC in matters relating to the interpretation and enforcement of the federal securities laws. *Basic, Inc. v. Levinson*, 485 U.S. 224, 239, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988). *See also* John C. Coffee, *First Anniversary: PSLRA of 1995*, N.Y.L.J., Jan. 10, 1997, at 5; William S. Lerach & Eric Alan Isaacson, *Pleading Scienter Under Section 21 D(B)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness, and the Private Securities Litigation Reform Act of 1995*, 33 SAN DIEGO L.REV. 893 (1996); Elliott J. Weiss, *The New Securities Fraud Pleading Requirement: Speed Bump or Road Block?*, 38 ARIZ.L.REV 675 (1996); Andrew B. Weissman, *Symposium of Silicon Graphics*, 1 SEC.REFORM ACT LITIG RPTR 673, 787 (1996).

**5.** In this debate, the Congressional committee reports are instructive. The House Conference Report on the PSLRA states that Congress did "not intend to codify the Second Circuit's case law interpreting this pleading standard." stating as follows:

### B. Plaintiffs' Amended Complaint Sufficiently Pleads Fraud And Scienter

■ Ultimately, this Court is not required to solve this percolating issue because Plaintiffs' allegations sufficiently plead scienter under each of the foregoing approaches, including the strong inference of conscious deceit standard offered by Defendants. As outlined above, Plaintiffs' Amended Complaint alleges in sufficient detail that Defendants knowingly made numerous false and misleading statements in order to inflate the value of its stock which, in turn, allowed Defendants to acquire other companies it would not have been able to acquire had the value of its stock not been at sufficiently high levels. AC, ¶¶ 3, 55, 90, 107. Plaintiffs specifically allege that Defendants engaged in an elaborate scheme designed to insure that Defendants met earnings and revenue projections of private securities analysts because Defendants knew that not meeting projections would decrease the value of its stock and thus make it impossible for Defendants to pursue their strategy of "growth by acquisition." *Id.* ¶¶ 3, 6. As elements of their scheme, Defendants allegedly knowingly made false and misleading statements about the progress of some of its major projects. *Id.* ¶¶ 4, 51. Further, to meet certain earnings projections, Defendants improperly recognized income that Defendants knew should not have been recognized under GAAP principles. *Id.* ¶¶ 55, 90.

In sum, Plaintiffs' Amended Complaint pleads fraud with sufficient particularity to satisfy Rule 9(b) and Plaintiffs' allegations, if true, are sufficient to show a "strong inference" of conscious deceit. Plaintiffs' allegations are also sufficient to show recklessness and that Defendants had both a motive and an opportunity to commit fraud. Thus, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims under the Exchange Act and Securities Act for failure to plead fraud with particularity under Rule 9(b) and for failure to plead scienter sufficiently under the PSLRA.

### C. The Statutory Safe Harbor And The Judicially Created "Bespeaks Caution" Doctrine

■ Defendants contend that Plaintiffs' claims are based entirely on forward-looking statements and thus are subject to the statutory safe harbors of the Exchange Act and the Securities Act and the judicially created "bespeaks caution" doctrine. The PSLRA amended both Acts by providing statutory safe harbors for certain forward-looking statements in certain circumstances. 15 U.S.C. §§ 77z–2(c), 78u–5(c); *see also Saltzberg*, 45 F.3d at 400; *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993).

This statutory safe harbor is similar to the judicially created "bespeaks caution" doctrine, embraced by several circuits. including the Eleventh Circuit. 15 U.S.C. § 78u–5(c); *see also Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399, 400 (11th Cir.1995) ("bespeaks caution" doctrine) (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir.1993)). A "forward-looking statement" includes (a) statements containing projections of revenues, income, earnings per share, or other financial items; (b) statements of the plans and objectives of management for future operations; and (c) statements of future economic performance. 15 U.S.C. § 78u–5(i)(1).

---

Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard. The plaintiff *must also* specifically plead with particularity each statement alleged to have been misleading. The reason or reasons why the statement is misleading must also be set forth in the complaint in detail. If an allegation is made on information and belief, the plaintiff must state with particularity all facts in the plaintiffs possession on which the belief is formed.

H.R.CONF.REP No. 104–369, at 41, *reprinted in* 1995 U.S.C.C.A.N. 679, 730, 740 (1995) (emphasis supplied), *see also Norwood Venture Corp.*, 959 F.Supp. 205, 207–08. On the other hand, the Senate Report on the Senate version of the same bill indicates that Congress did not discard entirely that Second Circuit case law either, stating that "the Courts may find this body of law instructive." S.REP. No. 104–98, 104th Cong., 1st Sess. 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694 (1995).

Similar to the "bespeaks caution" doctrine, the statutory safe harbor insulates a defendant from private securities liability for forward-looking statements if the forward-looking statement is identified as such and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A)(i). Even if the forward-looking statements are not accompanied by meaningful cautionary statements, defendants are insulated from liability if the plaintiff cannot show that the forward-looking statements were made by or with the approval of an executive officer of the company who had "actual knowledge" that they were false or misleading. 15 U.S.C. § 78u–5(c)(1)(B). Defendants also are insulated from liability if their forward-looking statements are immaterial to a plaintiff's claims. 15 U.S.C. § 78y–5(c)(1)(A)(ii).

■ However, the statutory safe harbor, like the "bespeaks caution" doctrine, does not insulate defendants from private securities liability based on statements that misrepresent historical/hard or current facts. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 & nn. 23 & 24 (1st Cir.1996) (referring to "bespeaks caution" doctrine, but noting that the doctrine had been codified in the PSLRA as the safe harbor provision); *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1405–06 (7th Cir.1995) (referring to "bespeaks caution" doctrine).

After reviewing Plaintiffs' Amended Complaint, the Court concludes that Defendants have not yet shown they are insulated from liability by the statutory safe harbor provisions of the Exchange Act or the Securities Act, or the "bespeaks caution" doctrine. While Plaintiffs' Amended Complaint refers to several forward-looking statements. Plaintiffs' Amended Complaint also refers to repeated misrepresentations or omissions of historical facts or "hard" facts about current or past conditions. Under these circumstances, courts have held that the statutory safe harbor provisions and the "bespeaks caution" doctrine are inapplicable. *See Shaw*, 82 F.3d at 1213 & n. 24; *Harden*, 65 F.3d at 1405–06; *Upton v. McKerrow*, 887

F.Supp. 1573, 1579 (N.D.Ga.1995). Therefore, the Court **DENIES** Defendants' Motion to Dismiss based on this ground.

### D. *Plaintiffs' Amended Complaint Alleges More Than Mere Mismanagement*

■ Defendants also contend that Plaintiffs' allegations of mismanagement are not actionable as a matter of law. In *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the United States Supreme Court determined that the federal securities laws do not regulate internal corporate mismanagement. *Id.* at 477, 97 S.Ct. at 1302–03. Thus, a complaint that merely alleges mismanagement or merely alleges failure to disclose mismanagement does not state a claim under the Exchange Act or the Securities Act. *Id.; In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir.1993); *Upton*, 887 F.Supp. at 1579.

However, if a defendant makes certain statements while that defendant knows that existing mismanagement makes those statements false or misleading, then the statements are actionable. *See Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b–5; nor will an allegation that a defendant failed to disclose the existence of mismanagement. . . . [H]owever, . . . a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement."); *see also Wells Fargo*, 12 F.3d at 927.

Plaintiffs do not base their claims on mere mismanagement or a failure to disclose mismanagement. Rather, Plaintiffs' Amended Complaint alleges that Defendants knew about the mismanagement of Imonics, including its severe operational problems, poor operating performance, and shoddy execution on critical projects. AC, ¶ 55. Plaintiffs allege that Defendants' knowledge of mismanagement at Imonics rendered many of Defendants' public statements false or misleading. Plaintiffs also allege that Defendants knew

that Imonics's severe problems negated Imonics's ability to perform its obligations on the Systems Integration Contract and the Re–Engineering Project. *Id.* As a result, the Court **DENIES** Defendants' Motion to Dismiss on this ground.

E. *Plaintiffs' Amended Complaint Sufficiently Alleges That Defendants Are Liable For The Reports Of Private Securities Firms*

To hold a defendant liable for statements made by private securities analysts, a plaintiff must demonstrate that the defendant has "sufficiently entangled itself with the analyst's forecasts to render those predictions 'attributable to it.'" *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir.1980); *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1059 (N.D.Cal.1993). A plaintiff must (1) identify specific forecasts and the company insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates when these interactions occurred. *Elkind*, 635 F.2d at 163; *Zeid v. Kimberley*, 930 F.Supp. 431, 435 (N.D.Cal.1996); *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir.1996). Finally, a plaintiff must specifically allege facts showing that the analysts' statements were misleading and that there was no reasonable basis for them when they were made. *Zeid*, 930 F.Supp. at 436.

Plaintiffs' Amended Complaint refers to numerous analysts' reports based on Defendants' misleading information. However, Defendants' Motion to Dismiss challenges only the sufficiency of Plaintiffs' allegations of entanglement regarding the analysts' reports released in late July 1996 discussing

Medaphis's earnings projections for the third and fourth quarter of 1996. *See* Defendants' Brief, at 29–30 ("Plaintiffs fail to allege particularly who at Medaphis conveyed what specific information to which analysts and when this interaction occurred.").[6]

Regarding these particular analysts reports, Plaintiffs sufficiently allege that the reports were based on misleading information provided by Defendants. *See* AC, ¶ 107; *Compare Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1310 (D.N.H.1996); *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F.Supp. 1260, 1267 (S.D.Fla.1996) ("At the pleading stage, all plaintiffs need allege is that defendants provided the information to the securities analyst, upon which the reports were based."). Plaintiffs also allege on what dates and how the interactions occurred. AC, ¶ 107; *Compare Timberland Co.*, 924 F.Supp. at 1312 (finding that entanglement was shown by allegations that "the following day Merrill Lynch directly relied on and incorporated [defendant's] remarks into its report."). Finally, Plaintiffs allege that Defendants, without any reasonable basis, endorsed and adopted each of the analysts' reports by, among other things, expressing comfort with the third and fourth quarter earnings estimates contained in one of the reports.[7] AC, ¶¶ 106, 107, 131(q); *Compare In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal.1994) ("There are no factual allegations that [the insider] entangled himself with the report *prior to* or after its publication ... *by endorsing or approving the spin its authors put on the information* he had disclosed or by attesting to the accuracy of its forecasts or conclusions." (emphasis supplied)), *aff'd*, 95 F.3d 922 (9th Cir.

---

6. Plaintiffs' Amended Complaint contains references to analysts' reports based on misleading information provided by Defendants. AC, ¶¶ 52–54, 85, 89, 106. However, the analysts' reports alleged to be actionable are only the reports about the positive implications of increasing staff levels at Imonics and the reports about Defendants' earning estimates for the third and fourth quarters of 1996. *See* AC, ¶ 131(p) & (q).

Also, while Defendants' Motion to Dismiss can be construed to challenge Plaintiffs' reliance on any of the analysts' reports contained in Plain-

tiffs' Amended Complaint, Defendants' Motion specifically addresses only Plaintiffs' allegation that "Medaphis 'endorsed and adopted' analysts' reports forecasting earnings per share for Medaphis for the third and fourth quarter 1996." Def. Brief. at 29.

7. Plaintiffs' Amended Complaint strengthens the significance of Defendants' expressing comfort with the analysts' reports by alleging that in the past, "management consistently hedged about its near-term operating results." AC, ¶ 106.

1996). Thus, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims on the ground.[8]

### F. *Plaintiffs' Motion For Class Certification*

Class discovery was stayed until the Court ruled on Defendants' Motion to Dismiss. Discovery now will proceed under the terms of the prior discovery consent Orders. Since there has been no class discovery, the Court **DENIES** as premature Plaintiffs' Motion for Class Certification without prejudice to Plaintiffs' refiling the Motion after the class discovery.

### III. *CONCLUSION*

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss [56–1] Plaintiffs' Consolidated Second Class Action Amended Complaint. The Court **DENIES** Defendants' (First) Motion to Dismiss [42–1] as **MOOT**. The Court **DENIES** Plaintiffs' Motion for Class Certification [40–1] **WITHOUT PREJUDICE** to refile at the conclusion of the class discovery.

---

8. Defendants' Motion to Dismiss does not specifically challenge Plaintiffs' reliance on analysts' reports other than those released on July 23–24, 1996.