CARLEY CAPITAL GROUP, et al., Plaintiffs,

v.

DELOITTE & TOUCHE, L.L.P., Defendant.

No. CIV. A. 1:97–CV–3183–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 16, 1998.

W. Pitts Carr, Render Crayton Freeman, Carr Tabb & Pope, Atlanta, Joseph H. Weiss, Mark D. Smilow, Weiss & Yourman, New York, NY, Miles M. Tepper, Office of Miles M. Tepper, West Orange, NJ, Stanley M. Grossman, D. Brian Hufford, phv, Brian Hufford, Pomerantz Haudek Block Grossman & Gross, New York, NY, Sherrie R. Savett, Carole A. Broderick, Genna D. Kidd, Berger & Montague, Leonard Barrack, Gerald J. Rodos, Barrack Rodos & Bacine, Philadelphia, PA, Fred Taylor Isquith, Neil L. Zola, Wolf Haldenstein Adler Freeman & Herz, New York, NY, Richard Bemporad, Lowey Dannenberg Bemporad & Selinger, White Plains, NY, Martin D. Chitwood, Christi Cannon Mobley, Chitwood & Harley, Atlanta, Jonathan M. Plasse, phv, Barbara J. Hart, Goodkind Labaton Rudoff & Sucharow, Richard H. Weiss, David J. Bershad, Milberg Weiss Bershad Hynes & Lerach, New York, NY, Andrew L. Barroway, Schiffrin Craig & Barroway, Bala Cynwyd, PA, Glen DeValerio, Berman DeValerio & Pease, Boston, MA, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, New York, NY, Robert M. Roseman, Spector & Roseman, Philadelphia, PA, Alan B. Rubenstein, Rackemann Sawyer & Brewster, Boston, MA, for plaintiffs.

John A. Chandler, Patricia Anne Gorham, Christine Leigh Hopkins Mitchell, Sutherland Asbill & Brennan, Atlanta, Stuart J. Baskin, phv, Shearman & Sterling, Alan A. Harley, phv, Deloitte & Touche USA, New York, NY, for defendant.

### ORDER

THRASH, District Judge.

This is a complex securities litigation case. It is before the Court on the (1) Defendant's Motion to Dismiss the Amended Complaint [Doc. No. 40]; (2) Defendant's Motion for Judgment on the Pleadings or to Dismiss [Doc. No. 41]; and (3) Plaintiffs' Motions for Leave to File Sur–Reply Memoranda [Doc. Nos. 55 and 56]. This matter came on for hearing on October 5, 1998. As a preliminary matter, this Court grants the Plaintiffs' Motions to File Sur-reply Memoranda [Doc. Nos 55 and 56]. For the reasons set forth below, the Court will deny the Motion to Dismiss and deny the Motion for Judgment on the Pleadings.

## I. BACKGROUND

The Plaintiffs filed this consolidated shareholder action asserting various securities-fraud claims against Defendant Deloitte & Touche, LLP. The facts in this case are related to claims arising in the action entitled *In re 1996 Medaphis Corporation Securities Litigation,* Civil Action No. 1:96–CV–2088–TWT (N.D.Ga.1996) (*"Medaphis* action"). The *Medaphis* action was settled for $72.5 million in cash and securities. This action is based, at least in part, on the discovery undertaken in the *Medaphis* action. The Plaintiffs bring this action on behalf of members of a potential class ("Class Plaintiffs") who purchased the common stock of Medaphis Corporation ("Medaphis") during the class period between February 6, 1996, through October 21, 1996. Certain Plaintiffs assert separate claims on behalf of members of a potential sub-class ("Sub-class Plaintiffs") who, in connection with a merger between Medaphis and Health Data Sciences Corp. ("HDS"), exchanged their shares of HDS stock for shares of Medaphis common stock between June 29, 1996, and October 21, 1996.

Medaphis sells outsourced business management services to doctors and hospitals, primarily for the management of billing and accounts receivable.[1] Medaphis also provided, during the relevant time period, systems integration and flow engineering services. For several years before the Class Period, a principal component of Medaphis' business strategy involved growth through acquisitions of other companies in the medical billing business. This acquisition strategy enabled Medaphis to report impressive growth of revenues from $86 million in 1991, to over $300 million in 1994. By 1994, Medaphis had grown from an obscure business into the dominant player in its field.

During the second half of 1994, however, the revenue and profit margins of the billing and accounts receivable management business declined. As a result, Medaphis began searching for new technologies to cut its internal costs of collecting and sending out bills. Medaphis also decided to focus on computer systems integration companies as acquisition targets. In December, 1994, Medaphis acquired the assets of a systems integration business, Gateway Conversion Technologies ("Gateway"), including scanning and optical character recognition software ("Imonics software"). This was Medaphis' entry into the systems integration business. After the acquisition, this aspect of Medaphis' business was conducted by its Imonics Corporation ("Imonics") subsidiary.

In July, 1995, representatives of Imonics met with representatives of two subsidiaries of Bertelsmann AG ("Bertelsmann"), a German corporation, regarding a possible joint venture arrangement to provide custom systems integration services to European customers. By the end of 1995, Imonics and the Bertelsmann subsidiaries identified DeTe Mobil, a large German company, as a potential client for customized software and reengineering solutions. On December 21, 1995, the last business day before the Christmas holidays and the end of the 1995 fourth quarter, Imonics and the Bertelsmann subsidiaries entered into two related agreements in connection with the purported joint venture to provide custom systems integration work in Europe.

In the first agreement, the parties executed a "Software Licensing Agreement," by which one of the Bertelsmann subsidiaries obtained a non-exclusive license to sub-license Imonics software to customers throughout Europe. That agreement provided that the Bertelsmann subsidiary would pay Imonics a license fee of five million Deutschmarks (approximately $3.5 million) upon delivery of the software. Under the Software Licensing Agreement, payment was not due until February 1, 1996. On the same day that the Software Licensing Agreement was executed, representatives of Imonics and another Bertelsmann subsidiary executed a letter agreement confirming the mutual intentions of entering into a "definitive joint agreement" on or before January 31, 1996.

1. The factual allegations of the Amended Complaint are deemed true with respect to the pending motions. *Bank v. Pitt,* 928 F.2d 1108, 1109 (11th Cir.1991). The issues raised in the Motion to Dismiss and the Motion for Judgment on the Pleadings may be revisited if the factual allegations of the Amended Complaint are tested by a motion for summary judgment.

If the closing of the joint venture did not occur in a timely fashion, Imonics would be required to pay liquidated damages in the amount of $3.6 million. Any obligations of an affiliate Bertelsmann subsidiary under the Software Licensing Agreement could be used to offset the liquidated damages amount. The joint venture between the parties was not formed until after January 31, 1996.

On March 29, 1996, the Imonics–Bertelsmann Joint Venture entered into a "Software Licensing and Software Engineering Contract" with DeTe Mobil (the "DeTe Mobil Contract"). The DeTe Mobil Contract provided that Imonics and Bertelsmann would provide systems integration services to create, in effect, a paperless office for DeTe Mobil. The project would incorporate certain existing Imonics software. The DeTe Mobil Contract provided that DeTe Mobil would be entitled to liquidated damages in the event that DeTe Mobil determined that the joint venture's performance was insufficient. On the day that the agreement was executed, the last day of the first quarter of 1996, Medaphis recorded $12.5 million in revenues. This represented its 50% share of anticipated earnings from software licensing fees due under the DeTe Mobil Contract.

The Defendant, a large international accounting firm, was the auditor and business consultant for Medaphis at all relevant times. The Defendant had an extensive in-house presence at Medaphis. The Defendant involved itself in the management of Medaphis by serving as a management consultant. The Defendant's representatives (1) occupied and continually staffed offices at Medaphis for duties performed in connection with Medaphis' business; (2) had unlimited access to all of Medaphis' records and documents; (3) attended meetings of Medaphis' Board of Directors and the Audit Committee of the Board; and (4) reviewed all license agreements concerning software owned by Medaphis. Before and during the class periods, the Defendant directed Medaphis' accounting and performed extensive analyses of Medaphis' systems integration efforts. For example, the Defendant examined the DeTe Mobil Contract in connection with its review of Medaphis' first quarter 1996 financial statements. Due to the Defendant's extensive audit and consulting activities, Medaphis was one of the largest clients of the Defendant's Atlanta office. The Defendant received almost $200,000 for evaluation of Medaphis' systems integration project alone. The Defendant also received large fees from Medaphis for services in connection with Medaphis' acquisitions, acquisitions which were dependent on Medaphis' continued earnings growth.

This securities fraud case is based primarily upon the Defendant's alleged false representations in connection with the reporting of Medaphis' financial results for 1995 and 1996. In the seven quarters before the Class Periods, Medaphis reported sequential increases in income before incurring what Medaphis describes as non-recurring charges. In the September 30, 1995, Form 10–Q, Medaphis disclosed that revenues from its billing and accounts receivable management services had declined. However, this quarterly report stated that the decline had been offset through expanded growth in its information management and systems integration services operations. The September 30, 1995, 10–Q report disclosed a net income of approximately $10.4 million before the non-recurring charges. By the fourth quarter of 1995, profits from billing and accounts receivable management services had virtually evaporated. However, on February 6, 1996, Medaphis issued a press release announcing its 1995 fourth quarter earnings of $11.4 million before the non-recurring charges. This represented a 50% increase in earnings over earnings during the fourth quarter of 1994.

On or about April 1, 1996, Medaphis filed its 1995 Form 10–K with the Securities and Exchange Commission ("SEC"), and disseminated its 1995 Annual Report to its shareholders and other members of the investing public. Medaphis' 1995 financial statements appeared in the 1995 Annual Report and were incorporated by reference in the 1995 Form 10–K. The financial statements stated that they were prepared on the basis of Generally Accepted Accounting Principles. The 1995 Form 10–K included the financial results for the 1995 fiscal year and fourth quarter as reported in the February 6, 1996,

press release. The 1995 Annual Report included the Defendant's March 15, 1996, audit opinion on Medaphis' 1995 financial statements. The audit opinion was incorporated by reference in the 1995 Form 10–K. The audit opinion stated that the financial statements were prepared in conformity with Generally Accepted Accounting Principles and that the financial statements presented fairly, in all material respects, the financial position of the company. A footnote to the financial statements expressly stated that revenues from systems integration contracts were recorded on the percentage of completion method of accounting.

In its audit opinion, the Defendant represented that its audit was conducted in accordance with Generally Accepted Auditing Standards. The Plaintiffs assert that this material representation was knowingly and recklessly false as the Defendant failed in a variety of ways to conduct its audit of Medaphis' 1995 financial statements in accordance with Generally Accepted Auditing Standards. (*See* Amended Complaint at ¶¶ 92–103). For example, the Plaintiffs allege with respect to the Software Licensing Agreement that the Defendant, in violation of Generally Accepted Auditing Standards, failed to obtain direct confirmation from the Bertelsmann subsidiary that the subsidiary actually owed Medaphis $3.5 million on December 31, 1995. (*Id.* at 98, 101). In addition, Plaintiffs allege that the Software Licensing Agreement showed on its face that it was not to be performed in 1995. Therefore, no revenues from the contract should have been recognized in 1995. (*Id.* at 38). The Defendant further represented that the financial statements fairly indicated Medaphis and its subsidiaries' financial condition at the end of 1995 in accordance with Generally Accepted Accounting Principles. The Plaintiffs assert that this material representation was knowingly and recklessly false. Among other things, they allege that the Defendant advised Medaphis during the course of the 1995 audit that Medaphis had understated expenses by $4 million. They further allege, in connection with the 1995 audit, that the Defendant had communicated to Medaphis' Audit Committee the overstatement of income relating to several systems integration contracts. Plaintiffs

allege that the 1995 audited financial reports overstated Medaphis' income by approximately $9 million. Nevertheless, the Defendant issued an unqualified opinion with respect to 1995 financial records incorporating the understated expense figures and overstated revenue figures.

The Plaintiffs also allege that the Defendant participated in the February 6, 1996, press release which contained materially false and misleading statements. They allege that the Defendant had informed Medaphis before the issuance of the press release that the results comported with Generally Accepted Accounting Principles and that the Defendant had reviewed and approved the press release before issuance. Nevertheless, according to the Amended Complaint, the February 6, 1996, press release reported, in violation of Generally Accepted Accounting Principles, approximately $3.5 million in purported revenue and income from the Software Licensing Agreement which was neither paid nor owed to Medaphis in 1995. Plaintiffs also allege that the press statement contained false reports of 1995 expenses and income.

On April 23, 1996, Medaphis issued a press release to announce its 1996 first quarter results. Medaphis included $12.5 million in revenues and income recognized in connection with the DeTe Mobil Contract in the 1996 first quarter figures even though the contract could not have been performed in that quarter. These revenues represented almost all of the $13.2 million in earnings that Medaphis was able to report for the first quarter of 1996. On May 14, 1996, Medaphis filed with the SEC its 10–Q quarterly report which echoed the financial results reported in the April 23, 1996, press release. The Plaintiffs assert that the statements concerning the 1996 first quarter financial results were materially false and misleading because such results included revenues and income from the DeTe Mobil contract in violation of Generally Accepted Accounting Principles and Medaphis' own stated revenue recognition policy. The Plaintiffs allege that the Defendant participated in the making of these statements by (1) reviewing and approving the April 23, 1996, press release before it was

issued; and (2) specifically directing the inclusion of $12.5 million of revenues and income from the DeTe Mobil Contract in the financial results reported.

Because of the materially false and misleading statements described above, the Plaintiffs allege that Medaphis was able to continue its practice of acquiring companies with artificially-inflated Medaphis Stock. In addition to acquiring Rapid Systems Solution and BSG Corporation, Medaphis announced, around May 24, 1996, its intention to acquire HDS in exchange for 6,125,000 Medaphis common shares and assumption or issuance by Medaphis of stock options representing an additional 556,000 shares. The merger was valued at approximately $273.5 million based on the closing price of Medaphis stock on May 24, 1996, at $40.938 per share. HDS was a developer and supplier of health care information systems to institutions, payers, health care networks, and providers. The merger agreement provided that HDS could unilaterally terminate the deal if the average closing price of Medaphis stock dropped below $37 per share.

On May 31, 1996, in connection with the HDS merger, Medaphis filed a registration statement with the SEC ("HDS Registration Statement"), which included a Proxy Statement/Prospectus ("Prospectus"). The HDS Registration Statement and Prospectus explicitly incorporated by reference the 1995 Form 10–K and the 1996 Form 10–Q for the first quarter of 1996. The Plaintiffs allege that the Defendant consented to the incorporation by reference of the March 15, 1996, audit opinion in the HDS Prospectus, knowing that it would be relied upon by HDS shareholders in determining whether to exchange their HDS shares for shares of Medaphis stock. The Plaintiffs allege that (1) HDS never would have completed the merger if the full truth about Medaphis' financial condition had been disclosed; and (2) the Defendant's fraudulent conduct enabled Medaphis to purchase HDS with overvalued stock, thereby costing HDS shareholders hundreds of millions of dollars in losses.

In mid–1996, DeTe Mobil became dissatisfied with Medaphis' performance of the systems integration agreement and decided to terminate the agreement. This made it impossible for Medaphis to earn the income it had already reported for the first quarter of 1996. On August 14, 1996, Medaphis announced that it would lose $0.28 to $0.33 per share in the 1996 third quarter. The Plaintiffs allege that Medaphis stock price plunged downward $21.375 per share to close at $14.25 per share on August 15, 1996. The August 14, 1996, press release reported that a substantial portion of its difficulties arose from the need to reorganize the Imonics subsidiary and problems with the DeTe Mobil Contract. According to the press release, approximately $9 million of charges would be made during the 1996 third quarter to account for the "restructuring" of the DeTe Mobil Contract with another $15 million relating to the Imonics reorganization.

On October 22, 1996, Medaphis disclosed its actual financial results for the third quarter and announced that the previously reported revenues and earnings for the fourth quarter and full year of 1995 were false and had to be restated. The October 22, 1996, press release explained that the restatements in earnings for these time periods resulted principally from improperly recorded revenues in the Imonics division. In the press release, Medaphis admitted that the Imonics unit had improperly booked revenue on the Software Licensing Agreement. Medaphis reported a loss of $36.4 million for the 1996 third quarter. Further, Medaphis disclosed total charges of approximately $50 million in the third quarter relating primarily to the reorganization of Imonics and the write-off of revenue from the DeTe Mobil contract. As a result of these disclosures, Medaphis' stock dropped to $10.375 per share.

Based on these allegations, the Class Plaintiffs assert that the Defendant knowingly and recklessly violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated by the SEC pursuant to Section 10(b). They allege that during the class periods, the Defendant made the false and misleading statements discussed above concerning the financial condition of Medaphis while having either actual knowledge of the false representation or acting with reckless disregard for the truth even though the

facts were available to it. As a result of these false statements, the Plaintiffs assert that the market price of Medaphis common stock was inflated and that Plaintiffs purchased their shares at these inflated prices in reliance either on the integrity of the market or directly on the statements and reports of the Defendant.

The Sub–Class Plaintiffs further assert that the individual Defendant is liable under Section 11 of the Securities Exchange Act, 15 U.S.C. § 77k. They assert that the Defendant caused and participated in the issuance of materially false and misleading statements to the public which were contained in the HDS Registration Statement and Prospectus. As a result, the Plaintiffs assert that they acquired shares of Medaphis stock pursuant to, or traceable to, the HDS Registration statement. They assert that they have been damaged due to the subsequent drop in the value of Medaphis stock.

The Defendant has moved to dismiss the case in its entirety under Fed.R.Civ.P. 12(b)(6) for failure to state a claim [Doc. No. 40]. The Defendant contends that the Plaintiffs' allegations as to Medaphis' unaudited 1996 first quarter earnings report and the various related press statements and financial statements do not state a Rule 10b–5 claim for primary liability. With regard to the allegations concerning both the audited 1995 earnings report and the 1996 first quarter earnings report, the Defendant contends that the Amended Complaint fails to comply with Fed.R.Civ.P. 9(b) and the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (" 'Reform Act' "), Pub.L. No. 104–67, 109 Stat. 743 (codified at 15 U.S.C. § 78u–4(b)). The Defendant contends that the Section 11 claim should be dismissed for failure to plead the allegations with the particularity required by Rule 9(b). The Defendant also contends that no Section 11 claim arises from Medaphis' unaudited 1996 first quarter financial results because it issued no statement concerning the results.

The Plaintiffs respond by arguing that the Amended Complaint properly identifies the Defendant's fraud with particularity and satisfies the heightened-pleading standards of

Rule 9(b) and the Reform Act. They contend that the Defendant may be primarily liable for participation in statements that are issued by others. They contend that the Defendant's misrepresentations in the audit report were material. The Plaintiffs further contend that they have sufficiently pled their Section 11 claim regarding the Defendant's false statements incorporated in the HDS Prospectus.

Pursuant to Fed.R.Civ.P. 12(c) and Rule 12(b)(6), the Defendant has filed a separate Motion for Judgment on the Pleadings or to Dismiss [Doc. No. 41]. The Defendant contends that the Plaintiffs were placed on notice of their asserted claims for relief more than one year before filing their original Complaint on October 21, 1997, and that the action is therefore time-barred by the one year statute of limitations in Section 9(e) of the Securities Exchange Act. The Plaintiffs respond that there is no basis for finding as a matter of law that the Plaintiffs discovered or should have discovered facts constituting the Defendant's alleged securities law violations before October 22, 1996.

## II. STANDARDS FOR A MOTION TO DISMISS

Generally, a complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief. Fed. R.Civ.P. 12(b)(6); *see Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero*, 963 F.2d 332 (11th Cir.1992); *In re ValuJet, Inc. Sec. Litig.*, 984 F.Supp. 1472, 1476 (N.D.Ga.1997). The Court must accept as true the facts pleaded in the complaint and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994–95 (11th Cir.1983). Exhibits and affidavits attached to the complaint may also be considered as part of the complaint. *See* Fed.R.Civ.P. 10(c); *Breckenridge Creste Apartments v. Citicorp.*, 826 F.Supp. 460, 464 (N.D.Ga.1993), *aff'd*, 21 F.3d 1126 (11th Cir.1994); *S.E.C. v. Shiell*, No. 76–204, 1977 WL 1044 at *2–3 (N.D.Fla.

Sept.27, 1977); *see also Schnell v. City of Chicago*, 407 F.2d 1084, 1085 (7th Cir.1969).

## III. SECTION 10(b) and RULE 10b–5 CLAIMS

Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, to use in connection with the mails or facilities of interstate commerce any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe .... " 15 U.S.C. § 78j. The SEC has adopted Rule 10b–5 which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To state a claim upon which relief can be granted for federal securities fraud under Rule 10b–5, a plaintiff must allege that "in connection" with the purchase or sale of securities: (1) the defendant made a false statement or omission of material fact; (2) with scienter; (3) upon which the plaintiff justifiably relied; and (4) that caused the plaintiff to suffer injury. *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997); *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989). The Plaintiffs rely upon the "fraud on the market" doctrine to show reliance. The doctrine's premise is that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, all material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). In the context of these Motions to Dismiss, the Defendant does not challenge the Plaintiffs' reliance on the fraud on the market doctrine.

### A. FALSE STATEMENTS OR OMISSIONS

The Plaintiffs allege that the Defendant made several false and misleading statements in connection with the audit opinion of Medaphis' 1995 financial statements, including the fourth quarter financial results. They further allege that the Defendant made false statements in connection with overstating revenues in Medaphis' 1996 first quarter report. The Defendant first contends that its Motion to Dismiss must be granted with respect to the overstatement of first quarter 1996 earnings (booking $12.5 million in revenue before it was earned) because the earnings reports were unaudited and no statement was made by it to the public regarding the 1996 earnings. The Defendant contends that its alleged conduct regarding the first quarter 1996 conduct amounts to nothing more than aiding and abetting liability, which is not actionable under Rule 10b–5.

In *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court considered whether private civil liability under Section 10(b) extends to those who do not engage in the manipulative or deceptive device, but who instead aid and abet the violation. *Id.* at 167, 114 S.Ct. at 1443. After examining the text of the statute, the Supreme Court concluded that Congress never intended to impose secondary liability under Section 10(b) and the statute therefore "does not itself reach those who aid and abet a § 10(b) violation." *Id.* at 177, 114 S.Ct. at 1448. According to the Supreme Court, the statute "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Id.* The Supreme Court did not hold that secondary actors in the securities market are always free from liability under the Securities Act. Rather, "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under [Rule] 10b–5, as-

suming all of the requirements for primary liability under Rule 10b–5 are met." *Id.* at 191, 114 S.Ct. at 1455.

Since the decision in *Central Bank*, the federal courts have split over the threshold required to show that a secondary actor's conduct constitutes primary liability. The Eleventh Circuit has yet to consider this issue. In *In re Software Toolworks, Inc.*, 50 F.3d 615 (9th Cir.1994), *cert. denied*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995), the Ninth Circuit held that secondary third parties may be primarily liable for statements made by others in which the third party significantly participated. *Id.* at 628 n.3 (an accountant may be primarily liable based on its "significant role in drafting and editing" a letter sent by the issuer to the SEC). By contrast, the Second Circuit has determined that more than significant participation by the secondary actor is needed to incur primary liability. *See Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997) ("[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank*"). In noting that a defendant must "make" a false or misleading statement, the Second Circuit has held:

> [A] secondary actor cannot incur primary liability under the [Securities] Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as "[r]eliance only on representations made by others cannot itself form the basis of liability." Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision.

*Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998).

█ Attached to the Plaintiffs' response to the Defendant's motion is an *amicus* brief of the SEC. (Doc. No. 50, Exh. C). In that *amicus* brief filed in connection with another securities litigation case, the SEC urges the courts to adopt a standard for primary liability by secondary actors that falls in between the Second and Ninth Circuits. In the wake of *Central Bank*, the SEC urges that an entity can be primarily liable when it, acting alone or with others, creates a misrepresentation. (Doc. No. 50, Exh. C at 16–17). To be liable, a defendant does not necessarily have to be identified to investors. (*Id.* at 16). The SEC believes that the test should look to what a secondary actor does in "creating a misrepresentation" to determine when that actor makes a misrepresentation in violation of Section 10(b). The views of the SEC are entitled to consideration and some deference. *See Basic Inc.*, 485 U.S. at 239, fn. 16, 108 S.Ct. at 987. This Court adopts the standard urged by the SEC and concludes that a secondary actor can be primarily liable when it, acting alone or with others, creates a misrepresentation even if the misrepresentation is not publicly attributed to it. Under the Second Circuit standard, a secondary actor who is the actual creator and author of a material misstatement could avoid liability simply due to the concealment of its identity. The Court finds that there is nothing in *Central Bank* with regard to its use of the terms "makes" or "making a material misstatement" that limits liability to those individuals who sign documents or are otherwise identified to investors. The standard adopted by the Court is consistent with the "directly or indirectly" language in Section 10(b).

█ With regard to the overstatement of 1996 first quarter earnings, the Plaintiffs allege in the Amended Complaint that the Defendant "specifically directed the inclusion of $12.5 million of revenues and income from the DeTe Mobil Contract" in the 1996 first quarter financial statements. The Court finds that the Plaintiffs have alleged more than aiding and abetting and have sufficiently alleged a primary violation of Rule 10b–5 against the Defendant with respect to the 1996 first quarter financial report of Medaphis. While the 1996 first quarter report does not identify the Defendant or otherwise attribute the inclusion of the $12.5 million to the Defendant, the Plaintiffs have sufficiently alleged that the Defendant created the misrepresentation by directing Medaphis to include that revenue and income in the report. More than mere participation, complicity, or assistance, the Plaintiffs have essentially al-

leged that the Defendant was the author of the alleged misstatement. Accordingly, the Court does not dismiss the allegations in the Amended Complaint with respect to the overstatement of first quarter 1996 earnings.

■ The Defendant next contends that the allegations in the Amended Complaint with respect to the audited 1995 earnings report and unaudited 1996 first quarter earnings report should be dismissed for failure to comply with Rule 9(b) and the heightened-pleading standards of the Reform Act. The Court must look to the Amended Complaint to determine whether the elements of a 10b–5 fraud action have been properly pled. Complaints alleging fraud must meet the heightened-pleading standards of Rule 9(b), which requires that "in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A fraud claim meets the requirements of Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral presentations, who made the statements, the time and place of the statements, the contents of the statements or manner in which they misled the plaintiff, and what the defendants gained as a consequence. *Brooks v. Blue Cross and Blue Shield of Florida,* 116 F.3d 1364, 1371 (11th Cir.1997).

In adopting the Reform Act, the Congress found that Rule 9(b) was not sufficient to prevent the filing of abusive private securities fraud actions. Among other things, the Reform Act changed the pleading standards for alleging fraud in securities class action lawsuits. The Reform Act requires a securities-fraud plaintiff to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts on which the belief is formed. *Id.* Further, as to each statement or omission, the plaintiff must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). A complaint that fails to comply with any of these requirements must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).

■ To state a claim for accounting fraud, a plaintiff must adequately plead facts sufficient to support a conclusion that the defendant prepared false financial statements, and that the alleged financial fraud was material. *Zeid v. Kimberley,* 973 F.Supp. 910, 922 (N.D.Cal.1997). Although the complaint need not specify the exact dollar amount of each accounting error, it must identify particular transactions underlying the alleged accounting irregularities. *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 926–27 (9th Cir.1993), *cert. denied,* 513 U.S. 917, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). Violations of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards may constitute false or misleading statements of material fact in violation of Rule 10b–5. *See Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1472 (N.D.Ga.1997); *In re Discovery Zone Securities Litig.,* 943 F.Supp. 924, 936–37 (N.D.Ill.1996); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1305 (C.D.Cal. 1996); *Simpson v. Specialty Retail Concepts, Inc.,* 908 F.Supp. 323, 329 (M.D.N.C.1995); *Lerch v. Citizens First Bancorp., Inc.,* 805 F.Supp. 1142, 1154–55 (D.N.J.1992).

■ In the Amended Complaint, the Plaintiffs claim that the Defendant artificially inflated and supported Medaphis' stock price by materially misleading the public with respect to revenue recognition and false reporting of expenses in connection with the 1995 and 1996 first quarter earnings reports. The Plaintiffs claim that the false reporting of expenses and income led directly to the acquisition of companies, such as HDS, with that artificially-inflated stock. The Plaintiffs allege several specific violations of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards in connection with the Defendant's audit of the 1995 earnings report that was disseminated to the shareholders. With respect to the audit opinion, the Plaintiffs allege that the Defendant violated Generally Accepted Auditing Standards principles in connection with the revenue recognition of $3.5 million. The Plaintiffs allege that the Defendant, contrary

to its representation in the 1995 earnings report of conformance to Generally Accepted Auditing Standards principles, failed to obtain direct confirmation from the Bertelsmann subsidiary that the subsidiary actually owed the $3.5 million in 1995. They further allege that the Defendant violated Generally Accepted Accounting Principles in connection with the 1995 earnings report by (1) understating expenses by over $4 million; and (2) overstating and recognizing income from the Software Licensing Agreement and other systems integration contracts. The Plaintiffs further allege that Defendant violated Generally Accepted Accounting Principles in connection with the 1996 first quarter earnings report by expressly directing the improper inclusion of $12.5 million in revenue from the DeTe Mobil Contract. The Court finds that these claims are set forth with sufficient particularity to support a claim of securities fraud against the Defendant. Accordingly, when viewing every allegation in the Amended Complaint as true, the Court finds that the Plaintiffs have made sufficient allegations of securities fraud against the Defendant to constitute false or misleading statements for the purposes of a Rule 10b–5 claim.

### B. *MATERIALITY*

 Materially misleading statements or omissions by a defendant constitute the primary element of a Rule 10b–5 violation. *Basic Inc.,* 485 U.S. at 246–47, 108 S.Ct. at 991–92. A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Id.* Materiality is a mixed question of law and fact. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2nd Cir.1985). A complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could differ on the question of their importance." *Id.* When viewing the allegations in the Amended Complaint as true, the alleged false misrepresentations in connection with

the 1995 earnings report and the 1996 first quarter earnings report are clearly not so unimportant that reasonable minds could not differ as to their materiality. The Plaintiffs allege that the false representations in the financial reports allowed Medaphis to continue portraying itself as a profitable and growing company. If the allegations in the Amended Complaint are true, Medaphis' earnings were declining in 1995 and were nonexistent in the first quarter of 1996. This was concealed from investors by fraudulent misrepresentations. Whether earnings are increasing or decreasing is highly material to investors. Accordingly, the Plaintiffs have sufficiently pled the element of materiality as to the Defendant.

### C. *SCIENTER*

 The Plaintiff must properly allege scienter in order to state a claim pursuant to Section 10(b) and Rule 10b5. The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Before the enactment of the Reform Act, the law in the Eleventh Circuit was clear that "a showing of 'severe recklessness' satisfies the scienter requirement." *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir. 1989).[2]

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (*quoting Broad v. Rockwell International Corp.,* 642 F.2d 929, 961 (5th Cir.)(*en banc* ), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). In the Eleventh Circuit, there was no special pleading standard for securities fraud actions.

2. Both sides cite this case as setting forth the law in the Eleventh Circuit.

Prior to the Reform Act, the Second Circuit adopted a special heightened pleading standard for securities fraud cases. It held that "to serve the purposes of Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2nd Cir.1994). However, in some cases, it also held that a plaintiff could satisfy this heightened pleading standard by alleging (1) facts constituting strong circumstantial evidence of reckless or conscious misbehavior, or (2) facts showing that the defendants had both motive and opportunity to commit fraud. *Id.* Arguably, the "motive and opportunity" standard for alleging scienter lowered the bar more than the heightened pleading standard raised it. In practice, the Second Circuit applied the "motive and opportunity" standard in such a way that it is questionable whether there really were two ways of alleging scienter. In other words, without a showing of conduct sufficient to infer fraudulent intent, the Second Circuit always found insufficient showing of motive and opportunity to establish scienter. *See Shields*, 25 F.3d at 1130–31; *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 269–272 (2nd Cir.1993). Thus, in the Second Circuit, there was a heightened-pleading requirement but, at least in theory, a reduced standard as to the state of mind that must be alleged and proven to establish scienter.

The Reform Act requires that plaintiffs must set forth as to each statement or omission particular facts that give rise "to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The application of the Reform Act's standard has produced considerable debate in the district courts as to whether the Reform Act has adopted all or part of the Second Circuit standards for pleading scienter in securities fraud actions. Since the Reform Act's enactment, several courts have held that the Reform Act's requirements for pleading scienter is consistent with all aspects of the Second Circuit's jurisprudence. *See Fugman v. Aprogenex Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1250–53 (N.D.Ill.1997); *Marksman Partners*, 927

F.Supp. at 1311. In determining that the Reform Act adopts both aspects of the Second Circuit standard, the court in *Rehm* cited a report from the Senate Banking, Housing, and Urban Affairs Committee on the Reform Act's passage which stated:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit .... The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

*Rehm*, 954 F.Supp. at 1252 (*quoting* S.Rep. 98, 104th Cong., 1st Sess., 15 (1995)).

Conversely, other courts have concluded that Congress intended to strengthen the Second Circuit standard by holding that the "motive and opportunity" prong of the Second Circuit's pleading standard no longer suffices to raise a strong inference of scienter. *See In re Silicon Graphics, Inc. Securities Litigation*, 970 F.Supp. 746, 757 (N.D.Cal.1997); *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997). The courts in *Silicon Graphics* and *Norwood* noted a House Conference Report which stated that Congress intended to "strengthen the existing pleading requirements" and did "not intend to codify the Second Circuit's case law interpreting this pleading standard." *Silicon Graphics*, 970 F.Supp. at 756; *Norwood*, 959 F.Supp. at 208 (*quoting* H.R. Conf. Rep. No. 104–369, 104th Cong. 1st Sess. 41 (1995)). Moreover, these courts relied upon President Clinton's veto of the Reform Act, a veto that Congress overrode, in which the President stated that it was "crystal clear" that Congress intended the Reform Act to go beyond the Second Circuit standard. *Silicon Graphics*, 970 F.Supp. at 756; *Norwood*, 959 F.Supp. at 208. With regard to the first prong of the old Second Circuit standard, the courts in *Silicon Graphics* and *Norwood* relied on this legislative history in determining that a Plaintiff must show more than strong circumstantial evidence of reckless behavior. *See Silicon Graphics*, 970 F.Supp. at 756–57;

*Norwood,* 959 F.Supp. at 208–09; *see also Powers v. Eichen,* 977 F.Supp. 1031, 1038–39 (S.D.Cal.1997). Thus, to establish scienter, these courts hold that the plaintiff must set forth facts that "create a strong inference of knowing or intentional misconduct" on the part of the defendants. *Silicon Graphics,* 970 F.Supp. at 757. The courts in *Norwood* and *Silicon* therefore hold that the Reform Act intended a higher pleading requirement than that of the Second Circuit by not codifying its motive, opportunity and recklessness standards.

While holding that Congress eliminated the "motive and opportunity" prong under the Reform Act, other courts have held that a plaintiff may still plead facts showing strong circumstantial evidence of reckless behavior. *See In re Stratosphere Securities Litigation,* 1 F.Supp.2d 1096, 1107 (D.Nev. 1998); *Novak v. Kasaks,* 997 F.Supp. 425, 430 (S.D.N.Y.1998); *In re Baesa Securities Litigation,* 969 F.Supp. 238, 240–42 (S.D.N.Y.1997). In *Baesa Securities,* the court focused on the statutory language of § 78u–4(b)(2) which requires plaintiff to set forth as to each statement or omission particular facts that give rise to a strong inference that the defendants acted with the requisite scienter. The court concluded that nothing in this statute eliminated the recklessness aspect of the scienter requirement. *Id.* at 241. While adopting the "strong inference" requirement, the court concluded that the statute neither mentions "motive and opportunity" nor singles out any other special particulars sufficient to show scienter. *Id.* at 242. Because the statutory language is clear, the court concluded that it was neither necessary nor prudent to resort to the Reform Act's convoluted legislative history. *Id.* at 241–42.[3]

The Court is persuaded that the approach of *Baesa Securities* is the proper one. The Reform Act does what it says it does—no more and no less. The Act incorporates the heightened-pleading standard of the Second Circuit in that it requires the plaintiff to set forth particular facts that give rise to a

strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u–4(b)(2). However, the Act did nothing to change "the required state of mind" with respect to this type of action. This conclusion is consistent with the Conference Committee Report on the Reform Act which stated that the Committee strengthened pleading requirements, but "chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." H.R. Conf. Rep. No. 104–369, 104th Cong. 1st Sess. 41 (1995). It is also consistent with the Joint Explanatory Statement of the Committee of Conference Regarding S. 1260, the Securities Litigation Uniform Standards Act of 1998. In that Statement, the Conference Committee stated:

> It is the clear understanding of the managers that Congress did not, in adopting the Reform Act, intend to alter the standards of liability under the Exchange Act. The managers understand, however, that certain Federal district courts have interpreted the Reform Act as having altered the scienter requirement. In that regard, the managers again emphasize that the clear intent in 1995 and our continuing intent in this legislation is that neither the Reform Act or S. 1260 in any way alters the scienter standard in Federal securities fraud suits. Additionally, it was the intent of Congress, as was expressly stated during the legislative debate on the Reform Act, and particularly during the debate on overriding the President's veto, that the Reform Act established a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals. Indeed, the express language of the Reform Act itself carefully provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." The Managers emphasize that neither the Reform Act nor S. 1260 makes any attempt to define that state of mind.

---

**3.** A fourth set of cases have dodged the issue. *Gross,* 977 F.Supp. at 1472; *In re ValuJet, Inc. Securities Litigation,* 984 F.Supp. 1472 (N.D.Ga.

1997); *In re Miller Industries, Inc. Securities Litigation,* 12 F.Supp 2d 1323 (N.D.Ga.1998). The issue cannot be dodged in this case.

After careful review of the legislative history of the Reform Act, the Court is convinced that the Second Circuit's two pronged standard of (1) motive and opportunity or (2) conscious misbehavior or recklessness relate to the definition of state of mind and are not incorporated in or repealed by the Reform Act.

As noted above, the Eleventh Circuit has clearly defined the state of mind required to establish scienter in a securities fraud action. This Court is bound by Eleventh Circuit precedent and not by the caselaw of the Second Circuit. The Eleventh Circuit has never adopted a scienter standard that follows the "motive and opportunity" analysis of the Second Circuit. A good argument can be made that the "motive and opportunity" standard, if honestly applied, lowers the bar for securities fraud cases below that mandated by the Supreme Court in *Hochfelder*. Greed is a ubiquitous motive, and corporate insiders and upper management always have opportunity to lie and manipulate. Furthermore, allowing private securities class actions to proceed to discovery upon bare allegations of motive and opportunity would upset the delicate balance of providing a remedy for genuine fraud while preventing abusive strike suits that the Reform Act sought to achieve. Motive and opportunity will ordinarily be relevant, and often highly relevant, to a finding of fraudulent intent. However, the Court concludes that a showing of motive and opportunity alone are insufficient to allege securities fraud under the "severe recklessness" standard established by the Eleventh Circuit.

For the same reasons, the Court rejects the argument that the Reform Act requires a showing of intentional misconduct or conscious misbehavior. "[W]here Congress intended to establish knowing conduct as a prerequisite for liability, it did so explicitly within the Reform Act, such as providing a safe harbor for forward looking statements." *Stratosphere Securities,* 1 F.Supp.2d at 1107 (citing 15 U.S.C. § 77z–2(c)(1)(B); 15 U.S.C. § 78u–5(c)(1)(B)). These provisions regarding forward-looking statements would be ren-dered meaningless if actual knowledge were required for all allegedly misleading statements. *Stratosphere Securities,* 1 F.Supp.2d at 1107. Because recklessness is sufficient to prove scienter under the Reform Act unless the statute expressly provides otherwise, the Court concludes that a plaintiff can properly plead scienter by alleging facts constituting strong circumstantial evidence of severe recklessness or conscious misbehavior.[4]

▮▮▮▮ In this case, the Court finds that the Plaintiffs have adequately alleged that the Defendant recklessly or consciously misrepresented the revenues, expenses, and earnings of Medaphis to keep the stock high for the acquisition of other companies like HDS. While alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter. *See Gross,* 977 F.Supp. at 1472; *Rehm,* 954 F.Supp. at 1255–56. According to the Amended Complaint, the Defendant was not just an auditor. It was heavily involved in the management of Medaphis and had unrestricted access to its financial records and data. If the allegations of the Amended Complaint are true, the Defendant knew that its client was understating expenses and improperly recognizing revenue. As discussed above, the Plaintiffs have alleged numerous Generally Accepted Accounting Principles and Generally Accepted Auditing Standards violations against the Defendant, an accounting expert, which combined to have a dramatic effect on the financial results of Medaphis for 1995 and the first quarter of 1996. Defendant contends that any departures from Generally Accepted Accounting Principles (for example, understatement of expenses) were immaterial. However, accepting the allegations of the Amended Complaint as true, but for these alleged accounting rule violations, Medaphis could not have perpetuated its image as a high growth stock. The overstatement of Medaphis' financial condition, in turn, helped to allow Medaphis the opportunity to acquire other

4. The Court has reached the same conclusion in *Sturm v. Marriott Marquis Corp.,* 26 F.Supp.2d 1358, (Order 1998).

companies based on its artificially-inflated stock prices.

The allegations of the Amended Complaint, if true, establish more than mere mistakes in the exercise of professional judgment or negligence. If true, they are sufficient to show severe recklessness. As alleged in the Amended Complaint, the end of quarter revenue manipulations in 1995 and 1996 were highly suspicious, and a prudent auditor would have been on notice to inquire further even if it was not directly responsible for the manipulations. *See* 15 U.S.C. § 78J-l(a)(1) (as to 1996 only). The allegations of the Amended Complaint are at least as specific and particular as those in the *Medaphis* action that survived a motion to dismiss. Accordingly, when viewing the allegations of the Amended Complaint as true, the Court concludes that the allegations concerning the totality and magnitude of the Defendant's accounting violations constitute strong circumstantial evidence of reckless or conscious misbehavior.

### D. CAUSATION

The Plaintiffs must prove both actual causation (transaction causation) and proximate causation (loss causation) to prevail on their Rule 10b-5 claims. *Bruschi v. Brown,* 876 F.2d 1526, 1530 (11th Cir.1989). To plead transaction causation sufficiently, the Plaintiffs can allege that the Defendants' misrepresentations or omissions induced the Plaintiffs to make the investment. *In re Checkers Securities Litig.,* 858 F.Supp. 1168, 1177 (M.D.Fla.1994). To plead loss causation sufficiently, the Plaintiffs can allege they would not have invested had they known the truth, and that the untruth was in some reasonable direct way responsible for the loss. *Id.* A review of the Amended Complaint reveals that the Plaintiffs have adequately pled both actual and loss causation. Accordingly, the Defendant's Motion to Dismiss the Plaintiffs' Rule 10b-5 Claim is denied.

### IV. SECTION 11 CLAIM

In Count II of the Complaint, the Plaintiffs allege violations of Sections 11 of the Securities Act, 15 U.S.C. §§ 77k. This section imposes liability on signers of a registration statement if the statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. This section provides buyers with a cause of action against those who sell securities by means of a registration statement or a prospectus when those documents contain material misstatements or omissions. The Supreme Court has stated that Section 11 only applies when a document solicits the public to acquire securities. *John Nuveen & Co., Inc. v. Sanders,* 450 U.S. 1005, 1008, 101 S.Ct. 1719, 1720, 68 L.Ed.2d 210 (1981).

The Sub-Class Plaintiffs' Section 11 claim refers to Medaphis' acquisition of HDS based on information contained in the HDS Registration Statement and Prospectus. These Plaintiffs allege that they acquired Medaphis stock based on the Defendant's misrepresentations as to the audited 1995 earnings report which was incorporated into the HDS Registration and Prospectus. The Defendant does not challenge whether the HDS Registration Statement and Prospectus solicited the public to acquire securities. Rather, in moving to dismiss the Section 11 claim, the Defendant contends that the Plaintiffs have failed to plead this claim with sufficient particularity under Rule 9(b). In view of the discussion above in connection with the Rule 10b-5 claim, the Court finds that the Plaintiffs have sufficiently alleged their Section 11 claim. Accordingly, the Defendant's Motion to Dismiss this claim is denied.

### V. STATUTE OF LIMITATIONS

The Plaintiffs filed their original Complaint on October 21, 1997. In its Motion for Judgment on the Pleadings or to Dismiss, the Defendant contends that before October 22, 1996, the public domain included the August 14, 1996, press release and Form 10-Q that announced the write-offs of revenue from the DeTe Mobil Contract that had been recognized in the first quarter of 1996. The Defendant contends that this announcement, when combined with the resulting drop in the Medaphis stock price and the filing of 19

related federal securities class actions, sufficiently placed the Plaintiffs on inquiry notice of a securities fraud claim against the Defendant. The Defendant further contends that the August 14, 1996, press release placed the Plaintiffs on actual notice of the claims relating to the improper revenue recognition in the 1996 first quarter earnings report in connection with the DeTe Mobil Contract. Plaintiffs contend that they were not on notice as to the Defendants' liability, in part because Defendant and Medaphis lied about the reasons for restating the 1995 results and the losses in 1996.

 Securities-fraud claims under Rule 10b–5 must be brought within one year after discovery of the facts constituting the violation and within three years after the violation. 15 U.S.C. § 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The statute begins to run when the plaintiff "has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." *Knight v. E.F. Hutton & Co.,* 750 F.Supp. 1109, 1112 (M.D.Fla.1990) (quoting *Vigman v. Community Nat. Bank & Trust Co.,* 635 F.2d 455 (5th Cir.1981)). "[Q]uestions of notice and due diligence are particularly suited for a jury's consideration." *Kennedy v. Tallant,* 710 F.2d 711, 716 (11th Cir.1983). With respect to the factual issue of due diligence, courts must look to the state of mind of the plaintiff shareholder. *Durham v. Business Management Associates,* 847 F.2d 1505, 1509 (11th Cir.1988). Plaintiffs are not charged with inquiry notice until they knew or should have known that the Defendant acted with the requisite scienter. *See Law v. Medco Research, Inc.,* 113 F.3d 781, 786 (7th Cir. 1997). The Defendant bears the burdens of production and persuasion as to a statute of limitations defense. *Smith v. Duff and Phelps, Inc.,* 5 F.3d 488, 492, n. 9 (11th Cir.1993).

In this case, the Court cannot determine for purposes of this motion that the one year limitations period bars any of the Plaintiffs' claims. While the August 14, 1996, press release and the subsequent filing of 19 related lawsuits may have created suspicious circumstances as to the Defendant's conduct, the Court cannot conclude as a matter of law that they provided inquiry notice of the Defendant's reckless or intentional misconduct. Further, the press release and related lawsuits did not conclusively provide the Plaintiffs with actual notice of the Defendant's conduct related to the DeTe Mobil Contract. In order to show that the limitations period applies, the Defendant improperly relies upon evidence not referenced in the pleadings. The Defendant, therefore, has failed to establish as a matter of law that the Plaintiffs were placed on either actual or inquiry notice of any of the Plaintiffs' claims before October 22, 1996. While the Defendant's Motion for Judgment on the Pleadings or to Dismiss is denied, the statute of limitations issue may be revisited on a motion for summary judgment.

## VI. CONCLUSION

The Plaintiffs' Motions for Leave to File Sur–Reply Memoranda [Doc. Nos. 55 and 56] are GRANTED. The Defendant's Motion to Dismiss the Amended Complaint [Doc. No. 40] and Motion for Judgment on the Pleadings or to Dismiss [Doc. No. 41] are DENIED.