In re WORLD ACCESS, INC.
SECURITIES LITIGATION.

No. Civ.A. 1:99CV430DE.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 28, 2000.

W. Pitts Carr, Carr Tabb Pope & Freeman, Atlanta, GA, for Robert G. Knollenberg, movant.

Olimpio Lee Squitieri, phv, Abbey Gardy & Squitieri, New York City, Martin D. Chitwood, Christi A. Cannon, Chitwood & Harley, Atlanta, GA, Nadeem Faruqi, phv, Faruqi & Faruqi New York City, James S. Notis, phv, Abbey Gardy & Squitieri, New York City, Steven E. Cauley, phv, Cauley & Geller, Little Rock, AR, for Carol Milite, on behalf of herself and all others similarly situated, plaintiff.

Lester L. Levy, phv, Paul O. Paradis, phv, Carl L. Stine, phv, Wolf Popper, New York City, Leonard Barrack, phv, Daniel E. Bacine, phv, Barrack Rodos & Bacine, Philadelphia, PA, Mark C. Gardy, phv, Abbey Gardy & Squitieri, New York City, Martin D. Chitwood, Christi A. Cannon, Chitwood & Harley, Atlanta, GA, James S. Notis, phv, Abbey Gardy & Squitieri, New York, NY, for William B. Tanner, Thomas Heffernan, Tracey Heffernan, John W. Brothers, Cari Thompson, J. Melvin Murrey, Pat Brocato, David L. Turpin, plaintiffs.

James David Dantzler, Jr., J. Timothy Mast, Long Aldridge & Norman, Atlanta, GA, for defendants.

## ORDER

EVANS, District Judge.

The instant federal securities litigation is presently before the court on Defendants' opposed motion to dismiss the consolidated amended class action complaint ("complaint").

The instant complaint was filed on behalf of open market purchasers (Plaintiffs) of the common stock of World Access, Inc. ("WAX") during the period April 29, 1997 through February 11, 1999 (the "class period"), as well as those who received WAXS common stock in connection with either of two acquisitions completed by the company in the fall of 1998. Plaintiffs state that the instant action was commenced as a result of Defendants' disregard of their obligations to fully disclose necessary facts regarding the aforementioned transactions. Defendants have filed the instant motion to dismiss alleging that Plaintiffs' complaint is facially insufficient and that it fails to meet the heightened pleading requirements as espoused in Fed. R.Civ.P. 9(b).

WAXS is engaged in the development, manufacturing and marketing of wireline and wireless switching, transport and access products. (Amended Complaint, ¶ 17). In early 1997, WAXS unveiled a new proprietary product known as the CDX switch, which was supposed to allow

telecommunications companies to provide advanced services. Much of the instant litigation revolves around this flagship product, the CDX switch. On April 29, 1997, the first day of the class period, WAXS announced the shipment of its first CDX switch, together with a related product known as the WLL–2000, to Hondutel, a Honduran telecommunications provider. WAXS' press release proclaimed that "test results to date in Honduras have been quite encouraging and we continue to believe that these new proprietary international products will begin generating significant new sales and further improvements in gross profit margins for the company beginning in the second half of 1997." (Amended Complaint, ¶ 39).

In the complaint, Plaintiffs allege that Defendants failed to inform the investing public that the CDX switch was little more than a non-functional, incomplete prototype. (*Id.* at ¶¶ 35, 40). Additionally, Plaintiffs allege that the CDX switch failed to comply with international standards and did not function as represented because, among other things:

—Low audio problems resulted from having low voltage on the subscriber lines;

—Four percent of all calls were dropped for no known reason, 100 times in excess of industry standards;

—The switch held calls for as much as 45 seconds after the customer had disconnected;

—Calls experienced "audio popping";

—MFC Protocol was very slow, requiring four seconds per hop' in the network; and

—The CDX switch did not support the ISDN or C7 protocols.

(*Id.* at ¶ 45). Plaintiffs state that, although the CDX switch was unable to perform its intended applications, WAXS nevertheless shipped incomplete, non-functional merchandise to its customers. Also, WAXS continued to issue upbeat pronouncements on the switch and its prospects. On July 29, 1997, WAXS issued a press release announcing the company's second quarter 1997 financial results. In the July 29, 1997 press release, WAXS stated:

CDX and WLL–2000 sales for the quarter were approximately $500,000, primarily from a successful first office application agreement with Hondutel. Feedback from several international customers has been encouraging and we continue to believe these new international products will generate significant new sales for the Company beginning in the second half of 1997. Specifically, the Company has recently entered into an agreement with a private network operator in El Salvador for the deployment of 40,000 lines of phone service over the next two years utilizing the CDX switch.

(Amended Complaint, ¶ 49). Allegedly, based on WAXS' guidance, an analyst at Alex Brown & Company issued a report rating WAXS stock as a "strong buy" and stating "[t]he company believes the Latin American [CDX small Central Office] CO switch opportunity is 2–3 million lines at $200/line or a $400–$500 million opportunity." (*Id.* at ¶ 50).

Plaintiffs allege that as a result of this information, there was a dramatic response by investors. At the end of April 1997, WAXS stock closed at $9.75 per share. By May 30, 1997, the price had risen to $16.63 per share and closed at $20.50 by June 30, 1997. (*Id.* at ¶ 46). In their complaint, Plaintiffs allege that the individual Defendants took advantage of this increase in share price, collectively selling portions of their holdings, totaling over $34 million. (*Id.* at ¶¶ 47, 57).

On October 27, 1997, WAXS issued a press release reporting its financial results for the third quarter of 1997. In that report, Defendants reported $1.8 million in CDX sales and said such sales were responsible, in part, for an increase in gross profit margins from 29.4% in the third quarter of 1996 to 37.9% in the third quarter of 1997. (*Id.* at ¶ 61).

On March 5, 1998, Defendants issued a press release reporting its financial results for the fourth quarter as well as year end

1997. Defendants reported total sales of more than $92 million, an 82% increase from the previous year. With respect to the CDX switch, the press release stated, "[d]uring the second half of 1997, the Company sold approximately 6.5 million of its two new international products," the CDX and the WLL–2000. The report continued, stating that "[b]ased on the strength of several new contracts, we expect the sales of these new products to continue to increase during 1998." (¶¶ 71–72).

In the Complaint, Plaintiffs allege that WAXS artificially inflated its accounts receivables, inventories, total assets, sales, gross profit, operating income, and net income by failing to disclose the non-functional nature of the CDX switch. (¶¶ 3, 80). Specifically, the complaint alleges that customers who had received the non-functional CDX switches refused to pay for them, but WAXS failed to increase its reserves for doubtful accounts and continued to recognize revenue on CDX sales even though collection of the payment was unlikely. Plaintiffs also allege that, in order to hide increasing inventory, WAXS engaged in improper "bill and hold" transactions, shipping product to a nearby warehouse and recognizing revenue upon the shipments. (¶ 81(f)).

Based on WAXS' apparent positive financial performance, as well as continued purported high expectations for the CDX switch, analysts continued to recommend purchase of its stock. (¶¶ 85–87). In fact, on March 13, 1998, Wheat First Union ("Wheat") issued a report highlighting the positive contribution the CDX switch made to the Defendants' revenues:

> We believe that the CDX switch and the WLL–2000 contributed approximately $3.9 million to revenues in Q4'97, up from $2.0 million in Q3'97 ... The GCA Telecom systems contract valued at $20 million, that was announced on March 5, 1998, includes provisions for a number of CDX switches which gives us a higher

confidence in our estimates for sales going forward.

(¶ 75).

On May 11, 1998, following Defendants' first quarter earnings announcement, Prudential Securities ("Prudential") issued a report which, while noting a sequential dip in CDX sales for the first quarter, nevertheless continued to be positive on CDX prospects based on guidance received from WAXS management. In part, the Prudential report stated:

> We continue to believe that CDX sales will be up strongly this year based on recent bid activity, together with the fact that the company continues to ship products to existing CDX customers in Latin America. It is important to note that sales of the CDX tend to be lumpy in nature which should become less of an issue going forward as the Company continues to add more customers.

(¶ 87).

On July 29, 1998, WAXS issued a press release reporting its financial results for the second quarter of 1998. The Company reported a 98% increase in total sales and an 89% increase in net income over the same quarter of 1997. (¶ 91). WAXS management informed analysts that the Company realized $5 million in revenue from CDX and WLL–2000 sales during the quarter. (¶ 92).

During the Fall of 1998, WAXS' stock price temporarily stalled in response to an industry wide slowdown. Between September 28, 1998 and October 8, 1998, WAXS stock plunged by 43%, falling from $22.50 to $12.75. (¶¶ 130–33). In response to this decline, Defendant Odom was quoted as saying "[w]e were surprised by the decline in our stock price during the last few days. Our core business continues to be strong and on target for the year." (¶ 137).

On October 26, 1998, WAXS announced record third quarter financial results, with sales increasing by 96% over sales in the third quarter of 1997. In its press release,

WAXS represented that "[w]e continue to see significant demand for our wireless products, especially in international markets." (¶ 138). In the complaint, Plaintiffs allege that WAXS did not reveal that its inventories had mushroomed by nearly 300% during the third quarter. Instead, Plaintiffs allege that Defendants claimed that WAXS was "ramping inventory" to meet anticipated increases in demand. (¶¶ 140–42).

Accordingly Plaintiffs' complaint alleges that Defendants' false and misleading statements concerning the third quarter financial results, the ballooning inventory, and the anticipated demand for its products resulted in a strong rebound of the stock price. (¶¶ 138–43). WAXS' stock price closed near $17 on October 25, 1998 and traded in the range of $23 the following week. (¶ 143). As a result, WAXS completed an acquisition of NACT on October 29 and also completed an acquisition of TELCO on November 30, 1998. Each registration statement/prospectus filed in connection with those transactions, Plaintiffs allege, repeated all of the false and misleading information that had previously been disseminated by Defendants. (¶¶ 98–129). During November 1998, Defendants Kidder and Gergel sold over 80,000 shares of WAXS stock for over $1.8 million. (¶¶ 146–47). Meanwhile, Plaintiffs allege that WAXS' senior management, including Defendant West, were meeting with representatives of GCA Telecom, a network operator in El Salvador, concerning the defective CDX switch in an effort to convince GCA Telecom not to cancel its contract and to prevent a threatened lawsuit. (¶ 148).

On January 5, 1999, WAXS issued a press release announcing that it expected to report fourth quarter diluted earnings per share before special charges of $0.15, compared to analysts' estimates of $0.31 per share. (¶ 158). The Company cited "lack of any significant sales" of the CDX switch as a primary reason for the shortfall. WAXS also disclosed that it had sold nearly $10 million of Northern Telecom equipment at cost in order to reduce inventories and to make up for the lost CDX revenue. (¶ 158). As a result of this announcement, WAXS' stock dropped by nearly $9 per share, or 42%, to a 52 week low of $12.38 per share. (¶ 160). Despite this, Plaintiffs allege that Defendants did not acknowledge that customers had received non-functional switches, but instead portrayed the shortfall as a result of a delay in CDX orders of a few customers. (¶ 162).

On February 11, 1999, Defendants reported fourth quarter net income from continuing operations of $0.08 per share. (¶ 163). However, this did not include a loss for the quarter of $0.30 per share relating to discontinued operations, which the company described as consisting of the resale of Northern Telecom equipment and repair and refurbishment of third party equipment. (¶ 163).

Special fourth quarter charges of $92.6 million included "$36.1 million of costs associated with facilities consolidation, the outsourcing of manufacturing facilities, product rationalization and other strategic initiatives ..." (¶ 164). The "product rationalization" charges included the establishment of reserves for product obsolescence and doubtful accounts relating to the CDX switch and its apparent phase-out as a stand-alone product. With respect to this development, the Company stated:

> In line with our recent decision to integrate the Class 5 functionality of the CDX switch and the Class 4 functionality of NACT's STX switch into a next generation technology platform, reserves for potential doubtful accounts and potential inventory obsolescence were established to minimize the Company's balance sheet exposure to the CDX switch.

(¶ 164). After this statement, by noon on February 12, 1999, WAXS' shares had dropped from the previous day's closing price of $11.50 to $8.00 per share, a decrease of 30%. (¶ 165).

On April 9, 1999 WAXS filed its Form 10–k for 1998, which revealed that custom-

ers had experienced "performance difficulties" with the CDX switch and that it had dramatically reduced its forecast of 1999 CDX revenues. As a result, WAXS incurred substantial write-downs of CDX inventory and established substantial reserves for uncollectible CDX receivables. (¶ 167). These charges were outlined by Defendants in a footnote which read:

> The most significant component of the restructuring charges related to a change in the Company's long-term focus for its switching products, primarily its [CDX] switch. In January 1999, the Company elected to reallocate development resources targeted for the CDX switch as a stand-alone product to the integration of the central office functionality of NACT's switch into a common, next-generation technology platform. This strategic decision, performance difficulties experienced by certain customers' applications of the CDX switch in 1998, and dramatically reduced internal estimates for CDX switch revenues in 1999 caused the Company to significantly write-down all CDX related assets as of December 31, 1998 . . .

(¶ 167).

Through these series of announcements at the end of the class period, Plaintiffs allege that WAXS admitted that it had made no "significant sales" of the CDX switch during the fourth quarter of 1998, its internal estimates of CDX switch sales for 1999 had been "dramatically reduced," and its customers had experienced "performance difficulties" with the switch. As a result, WAXS was forced to incur a $23.6 million charge in that quarter in connection with the CDX switch. After these announcements, WAXS' stock price dropped to 8 ⁹⁄₁₆ per share, after trading as high as 38 ⁵⁄₁₆ during the class period. This decline precipitated Plaintiffs' investigation and ultimately the instant litigation which Defendants now seek to dismiss.

In order to survive a motion to dismiss, allegations of securities fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b). That rule provides, in relevant part, that "[t]he circumstances constituting fraud . . . shall be stated with particularity." Fed.R.Civ.P. 9(b). To provide a sufficient level of factual support for a claim of securities fraud, a plaintiff must plead the circumstances of fraud in detail. This means, as both parties point out, "[t]he who, what, when, where, and how." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). The Private Securities Litigation Reform Act ("PSLRA") of 1995 added several new pleading requirements to claims arising under the Exchange Act. First, the PSLRA provides that, in any private action premised on an untrue statement or omission of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Moreover, with respect to any claim where recovery is permitted "only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Essentially, a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.

Plaintiffs, in the instant case, bring suit under § 10(b) of the Exchange Act, making it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," 15 U.S.C. § 78j(b), and Rule 10b–5, making it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the state-

ments made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission of a material fact, 2) made with scienter, 3) on which plaintiff relied, 4) that proximately caused his injury. *See Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir.1989) (en banc).

■ In the present case, Defendants argue that Plaintiffs' complaint is deficient because it is brought upon "information and belief" [1] but fails to allege sufficiently the sources of Plaintiffs' allegations pursuant to 15 U.S.C. § 78u–4(b)(1). Specifically, Defendants contend that Plaintiffs' amended complaint fails to satisfy the PSLRA's pleading requirements with regard to misleading statements and omissions. Plaintiffs allege, however, that the complaint properly sets forth the specifics of Defendants' conduct by describing, in detail, the facts on which Plaintiffs' claims of fraud are based, including the statements which Plaintiffs claim to be false. (Plaintiffs' Complaint, ¶¶ 39, 41, 48–49, 51–53, 60, 61, 63–65, 69, 71, 72, 76–79, 83, 89–91, 93–95, 104, 105, 107, 118–21, 125–27, 137, 138, 144, 149, 150). Additionally, Plaintiffs maintain that the complaint identifies the source of the facts alleged which include SEC filings, press releases, consultations with former Company employees, former WAXS customers, as well as other individuals knowledgeable about its business and products. *Id.* at ¶ 8(f). Plaintiffs argue that these allegations are more than sufficient to survive Defendants' motion to dismiss.

Plaintiffs also state that, contrary to Defendants' assertion, the complaint adequately sets forth the factual basis for its allegations. Plaintiffs contend that they are not required to plead evidence at the motion to dismiss stage of the litigation,

even under the heightened standards espoused by the PSLRA. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir.1996). After a review of Plaintiffs' consolidated amended class action complaint, the court finds that Plaintiffs have met the initial pleading threshold of the PSLRA and Fed.R.Civ.P. 9(b). Specifically, the complaint alleges that Defendants' "CDX Switch product was a non-functional development-stage prototype, and not the fully designed and operable product [which Defendants] represented it to be." (Plaintiffs' complaint, ¶ 3(a)). In fact, the complaint enumerated eight identifiable problems, described with technologically descriptive nomenclature. (¶ 168). The complaint also alleges that WAXS sold these non-functional CDX switches, and that when customers learned that the switches did not operate properly, they refused to pay and canceled orders after their complaints went unheeded. (¶¶ 3(b), 3(h)). Moreover, the complaint identifies by name two customers, Aexis and GCA Telecom, who had specified grievances concerning the performance of the CDX switches, and who either disputed charges, or canceled (or raised the prospect of canceling) orders.

Plaintiffs' complaint avers that Defendants' financial statements were false or misleading because they did not make appropriate accounting entries to reflect nonpayments for disputes about CDX switches. While Plaintiffs provide a detailed citation of the specific Generally Accepted Accounting Principles ("GAAP") provisions allegedly violated by Defendants' accounting practices, Defendants nonetheless argue that Plaintiffs are required to explain how Defendants violated each specific GAAP provision or to set forth the specific details of any particular transaction underlying the alleged accounting fraud.[2] (¶¶ 171–75; Defendants' Brief,

---

1. Plaintiffs assert that the complaint states that the allegations are based not upon vague information and belief, but instead upon the investigation of counsel, drawing upon both publicly available information as well as confidential sources. (Plaintiffs' complaint, ¶ 8).

2. SEC Regulation S–X states that financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading or inaccurate, despite the presence of footnotes or other disclosures. 17 C.F.R. § 210.4–01(a)(1).

pp. 19–20). As Plaintiffs point out, they are not required to make such detailed allegations in order to sustain their claim of accounting fraud. Instead, here Plaintiffs have identified two multi-million dollar customers of WAXS, Aexis and GCA Telecom who had specific grievances about the performance of the switches and either disputed charges or canceled orders. Additionally, Defendants' own statements toward the end of the class period, admitting no "significant sales" in the fourth quarter of 1998 requiring substantial write-offs of CDX receivables and inventory, provide additional confirmation of the adequacy of Plaintiff's allegations. *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1335 (N.D.Ga.1998) (where plaintiffs alleged specific violations of GAAP and allege that resulting financial statements improperly overstated and recognized revenue, this sets forth a claim of accounting fraud for purposes of 10b–5).

Plaintiffs also allege that Defendants routinely employed improper "bill and hold" practices by shipping merchandise to a warehouse and then booking the "revenue" derived from such "sales" in violation of the Defendants' stated revenue recognition policy as well as GAAP. With respect to this allegation, Defendants' challenge, not the sufficiency, but instead the factual accuracy.

It is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendant transgressed, by customer, amount, and precise method. Ultimately, for purposes of Rule 9(b) as well as the heightened pleading standards of the PSLRA, allegations of specific problems undermining Defendants' optimistic claims coupled with allegations of dissemination of materially false statements are sufficient. The Court finds that these claims are set forth with sufficient particularity to support a claim of securities fraud against Defendants. Accordingly, when viewing every allegation in the Plaintiffs' complaint as true, the court finds that the Plaintiffs have made sufficient allegations of securities fraud against Defendants to constitute false or misleading statements for the purposes of a Rule 10b–5 claim. In the instant case, the Plaintiffs have alleged "[t]he who, what, when, where, and how." *DiLeo*, 901 at 627. For instance, Plaintiffs have alleged massive insider trading by the individual Defendants during the class period after receiving information not available to the public. Moreover, Plaintiffs have alleged that Defendants deliberately provided public misinformation regarding the potential success of the CDX switch, which they knew to be inoperable. This type of pleading specificity included in Plaintiffs' complaint meets the standards, under Rule 9(b) as well as the PSLRA, for properly alleging securities fraud.

With respect to the issue of what standard Plaintiffs must meet in order to plead scienter adequately under 15 U.S.C. § 78u–4(b)(2) in this Circuit, Plaintiffs cite to the recent case of *Bryant v. Avado Brands*, 187 F.3d 1271 (11th Cir.1999). In that case, the court held that a plaintiff must plead scienter by alleging with particularity facts which at least give rise to a strong inference that the defendant acted in a severely reckless fashion. *Id.* at 1284–85. Allegations showing motive and opportunity standing alone, however, are insufficient. *Id.* at 1286. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court, in holding that negligence was insufficient to trigger civil liability under § 10(b) and Rule 10b–5, defined scienter as a "mental state embracing intent to deceive, manipulate, or defraud."

In the instant case, the operative language of the Reform Act is that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Here, Plaintiffs have alleged facts that the court finds constitute strong circumstantial evidence of Defendants' recklessness and/or conscious misbehavior. The complaint alleges in great factual detail that the CDX switch was the first product WAXS ever manufactured and brought to market, yet

it was non-functional and never operational. (¶ 3.a). Moreover, the facts pled in the complaint allege that the President, CEO, and COO of the Defendant Company knew throughout the class period that its flagship product was non-functional and that its customers were canceling orders and refusing to pay for previous deliveries. (¶¶ 110, 180).

Additionally, Plaintiffs allege that Defendants failed to appropriate adequate reserves for sales for these nonfunctional products and engaged in improper "bill and hold" practices, in violation of GAAP, which, when coupled with an overstatement of financial results, give rise to a strong inference of reckless misconduct. *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998).

In the complaint, Plaintiffs also allege widespread insider trading by Defendants. In fact, Plaintiffs allege that the individual Defendants engaged in insider trading during the class period, collectively selling over 1.9 million shares for over $38 million. These sales allegedly represented a large percent of each individual's holdings. The complaint alleges that Defendant Gergel sold over 90 percent of his holdings; Defendant West sold over 80 percent; Defendant Kidder sold over 93 percent; and Defendant Clearman sold over 97 percent.

Defendants cite to the recent district court case of *In re Premier Technologies, Inc. Sec. Litig.,* (N.D.Ga. Dec. 14, 1999)[3], as support for the argument that Plaintiffs have not properly pleaded scienter. However, the factual scenario presented in the *Premier Technologies* case contains significant and material distinctions from the case at bar. For instance, in *Premier Technologies,* the product was allegedly not ready for release, and the product was not released. Conversely, here, the complaint alleges facts regarding Defendants' release of the product into the market despite the fact that it was not ready, the inadequacy of the reserves for the returns which would occur, the selling of the non-operational product to its customers, the receipt of complaints about the CDX switch from its customers and the cancellation of orders for the switch, and the improper booking of the revenue derived from such sales, in violation of the GAAP.

Defendants refer to the statement in *Premier Technologies* that, allegations of insider trading, "without more, are insufficient." *Id.* at 3. In the instant case, however, as noted above, the complaint relies on more than Defendants' massive insider trading in order to demonstrate that Defendants acted with the requisite scienter. Accordingly, the undersigned finds that Plaintiffs have met the heightened pleading requirements established by the PSLRA and explained in recent Eleventh Circuit caselaw. In the instant case, Plaintiffs have satisfied this burden. Here, Plaintiffs have plead scienter with particular facts that give rise to a strong inference that Defendants acted in a severely reckless manner.

With respect to Plaintiffs' claims of corporate mismanagement under the Exchange Act, Defendants contend that Plaintiffs essentially allege non-actionable corporate mismanagement and conduct which is protected by the business judgment rule. As pointed out by Defendants, the federal securities laws do not regulate internal corporate mismanagement. *Santa Fe Indus. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In fact, in most cases, the business judgment rule protects corporate management from liability when making good faith business decisions. *Munford, Inc. v. Valuation Research Corp.,* 98 F.3d 604, 611 (11th Cir. 1996). In this case, however, the undersigned finds that Plaintiffs have adequately alleged Rule 10b–5 claims rather than mere corporate mismanagement or differences in business judgment claims.

In Counts III, IV, and V of the complaint, Plaintiffs allege violations of §§ 11, 12(a)(2), and 15 of the Securities Act. Section 11 provides a cause of action against the signers of a registration statement that

---

**3.** Plaintiffs' complaint was dismissed, in part, without prejudice.

"[c]ontained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2) similarly provides a cause of action against any person who "offers or sells a security" by means of a prospectus or oral communication "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). Additionally, Section 15 makes control persons liable for violations of §§ 11 and 12 "with and to the same extent" as the persons they control. 15 U.S.C. § 77o. In the instant case, Defendants argue that these claims are facially insufficient as a matter of law and should be dismissed.

■ Section 11 provides buyers with a cause of action against those who sell securities by means of a registration statement or a prospectus when those documents contain material misstatements or omissions. The Supreme Court has stated that Section 11 only applies when a document solicits the public to acquire securities. *John Nuveen & Co., Inc. v. Sanders*, 450 U.S. 1005, 1008, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981).

Plaintiffs allege that Defendants made material omissions and misleading statements in both the NACT Registration Statement and the Teclo Registration Statement detailing material facts which were omitted by Defendants. (Plaintiffs' Complaint, ¶¶ 104–11, 128–29). Accordingly, Plaintiffs argue that the complaint extends well beyond the pleading requirements for Section 11. In view of the discussion above in connection with the Rule 10b–5 claim, the Court finds that the Plaintiffs have pleaded their Section 11 claim with sufficient particularity. Accordingly, the Defendants' Motion to Dismiss this claim is DENIED.

■ The Complaint alleges that the individual Defendants, namely Mo Siegel, Ronald V. Davis, Philip B. Livingston, Vestar/Celestial Investment Limited Partnership, John D. Howard, James P. Kelley, Arthur J. Nagle, Daniel S. O'Connell, Robert L. Rosner, and Barnet M. Feinblum, are responsible for Defendants' alleged fraudulent statements. Defendants argue, however, that the complaint's failure to match specific Defendant Company statements with specific Defendant Company insiders violates Rule 9(b). Identifying the individual sources of statements is unnecessary when the fraud allegations arise from mis-statements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987) (prospectuses, registration statements, annual reports, press releases, or other "group published information" are presumed collective actions). The Complaint thus adequately identifies the Defendants it alleges are responsible for Company statements, thereby putting them on notice sufficient to satisfy Rule 9(b). At this stage, it is enough that Plaintiffs have alleged that Defendants made misleading statements to analysts and those allegations meet the specificity requirements described herein. In this case, Plaintiffs avoid "fraud by hindsight pleading." Instead, Plaintiffs' complaint alleges that Defendants were aware of the falsity of the statements at the time they were made.

■ Moreover, in this case, Defendants are not entitled to dismissal based on the statutory safe harbor or the bespeaks caution doctrine with respect to the NACT or Telco Registration Prospectuses which contain only minimal boilerplate language. "Boilerplate warnings will not suffice as meaningful cautionary statements ... The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." H.R.Conf.Rep. No. 104–369, 104th Cong., First Sess. At 43 (1995). More,

neither the safe harbor provision nor the bespeaks caution doctrine are applicable when Defendants are aware, as alleged, of the facts that render their statements untrue when made. *Gross v. Medaphis Corp.*, 977 F.Supp. 1463 (N.D.Ga.1997). Accordingly, Defendants' motion to dismiss on this ground is hereby DENIED.

Defendants argue that Plaintiffs assert a Section 12(2) claim against the individual Defendants only. However, a reading of Count IV of the complaint demonstrates that the count is brought "against all defendants on behalf of all persons who acquired securities of WAXS in either the NACT merger or the Telco merger." (¶ 207). Defendants have conceded that the seller of stock in the Telco and NACT mergers was WAXS. Therefore, the court finds that Plaintiffs' § 12(a)(2) claim was properly brought against both WAXS as a seller and against the individual Defendants who participated in this sale.

■ Counts II and V of the complaint allege that each individual Defendant is liable as a "controlling person" under Section 20(a) and Section 15 of the Securities Act. In the Eleventh Circuit, "a defendant is liable as a controlling person ... if he or she 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'" *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir., 1996) (citations omitted).

Plaintiffs cite to a recent case from this district in which the court found control person liability under a similar factual scenario. The court in *In re Miller Industries, Sec. Litig.*, 12 F.Supp.2d 1323, 1333 (N.D.Ga.1998), stated that:

Here, Plaintiffs have adequately alleged controlling-person liability against the individual Defendants. The Plaintiffs alleged that the individual Defendants were all officers and directors of [Defendant Company]. Plaintiffs claim that because of their management positions and/or positions as directors, the individual Directors could control [Defendant Company's] general affairs, including the content of the public statements and financial statements disseminated by them. These allegations are sufficient to state a cause of action for controlling person liability.

Similarly, in this case, Plaintiffs have adequately alleged that each of the individual Defendants has control person liability within the meaning of § 20(a) of the Exchange Act and § 15 of the Securities Act. Moreover, Plaintiffs allege that WAXS, the controlled person, violated § 10(b) of the Exchange Act and §§ 11 and 12(a)(2) of the Securities Act, that the individual Defendants controlled its day to day operations, and that, by virtue of their positions, the individual Defendants could control the contents of WAXS' false statements. With respect to these claims, the court finds that Plaintiffs have plead with the requisite specificity. Accordingly, Defendants' motion to dismiss is hereby DENIED.

Defendants' motion to dismiss Plaintiffs' consolidated amended class action complaint [# 12] is hereby DENIED.